AMERICAN BOARD OF COMMISSIONERS FOR FOREIGN MISSIONS.

Appellant from Decree of Judge of Probate in re last Will and Testament of Solomon H. Chandler.

Cumberland.    Opinion November 12, 1906.

*Wills.   Testator must be of sound mind when will is executed.   Proponent must prove affirmatively that testator was of sound mind when will was executed.   Sanity. Insanity.   A " disposing mind," defined.   Mere intellectual feebleness to be distinguished from unsoundness of mind.   Testator under guardianship when will was executed.   Same a rebuttable presumption of fact, and does not work an estoppel upon proponent of will.   Testimony of medical experts.   Same considered.   Same subject to the test of reasonableness and consistency.   Prejudiced expert testimony.   Same an unsafe criterion.   R. S., chapter 69, section 26 ; chapter 76, section 1.*

Revised Statutes, chapter 76, section 1, provides as follows :

" A person of sound mind, and of the age of twenty-one years, may dispose of his real and personal estate by will, in writing, signed by him, or by some person for him at his request, and in his presence, and subscribed in his presence by three credible attesting witnesses, not beneficially interested under said will." There is no exception or qualification to the requirement that a person must be of sound mind in order to make a valid will, and the burden rests upon the proponent of the will to prove affirmatively that the testator was of sound mind when he made the will. Hence in probating a will the sanity of the testator must be proved ; it is not to be presumed.

But the word sanity is used in its legal and not its medical sense. Etymologically, insanity signifies unsoundness. Lexically, it signifies unsoundness of mind, or derangement of the intellect. In law, every mind is sound that can reason and will intelligently, in the particular transaction being considered ; and every mind is unsound or insane that cannot so reason and will. The law investigates no further. This definition clearly differentiates the sound from the unsound mind, in the legal sense.

A disposing mind involves the exercise of so much mind and memory as would enable a person to transact common and simple kinds of business with that intelligence which belongs to the weakest class of sound minds ; and a disposing memory exists when one can recall the general nature, con-

dition and extent of his property and his relation to those to whom he gives, and also to those from whom he excludes, his bounty. But mere intellectual feebleness must be distinguished from unsoundness of mind. The requirements of a "sound and disposing mind" does not imply that the powers of the mind may not have been weakened or impaired by old age or bodily disease.

It is a well established rule in this state that while confinement in an insane asylum or the disability of guardianship is made prima facie evidence of some mental incapacity, yet it is a rebuttable presumption of fact and may be overthrown by a preponderance of the evidence. The incapacity of guardianship is simply a fact which may be proven like any other fact tending to establish mental incapacity, but it does not work an estoppel upon the proponent of a will. R. S., chapter 69, section 26, recognizes this principle and provides, among other things, that "when a person over twenty-one years of age is under guardianship, he is incapable of disposing of his property otherwise than by his last will."

MEDICAL EXPERTS. In the consideration of the testimony of medical experts the test of consistency and reasonableness always having reference to the other testimony in the case, which their opinions may tend to corroborate or contradict, should be applied.

The opinion of a medical expert whose testimony does not differentiate between a medically sound mind and a legally sound mind is entitled to weight only when the other evidence shows that it applies to legal unsoundness, as a mind legally sound may be medically unsound. On the other hand, a medically sound mind necessarily includes a legally sound mind.

When it appears that the opinion of a medical expert is made up from a prejudiced view and for a predetermined purpose, then the ordinary rule of law with reference to the effect of interest upon credibility should be applied with special force, as such opinion evidence presents an unsafe criterion upon which to found a judgment affecting important interests. Such testimony is not only worthless but insidious and dangerous, for it is impossible for the layman in the analysis of such testimony to distinguish the true from the untrue. And if the untrue is acted upon, injustice must follow.

On report. Appeal dismissed. Decree of Probate Court affirmed in part. Case remanded for further proceedings in accordance with opinion.

Appeal by the American Board of Commissioners for Foreign Missions from the decree of the Judge of Probate, Cumberland County, approving and allowing certain instruments as the last will and testament and codicils thereto, of Solomon H. Chandler late of New Gloucester, Cumberland County, deceased. This appeal was to the Supreme Judicial Court, sitting as the Supreme Court of

Probate, held at Portland on the second Tuesday of October, A. D. 1904, and was taken in accordance with the provisions of the Revised Statutes, chapter 65, section 28. The appeal and reasons of appeal are as follows :

"STATE OF MAINE.

" To the Honorable, the Judge of the Probate Court, in and for the County of Cumberland :

"Respectfully represents American Board of Commissioners for Foreign Missions, a corporation legally existing and located in Boston in the County of Suffolk and Commonwealth of Massachusetts, that it is interested in the estate of Solomon H. Chandler, late of New Gloucester in said County of Cumberland, deceased, of which said court has now jurisdiction, as residuary legatee under a certain instrument purporting to be· the last will and testament of said deceased, dated September ·17, 1897, and certain instruments purporting to be the last will and testament and codicils thereto of the said deceased, dated respectively March 10, 1896, August 11, 1896, and August 9, 1902, that it is aggrieved by your Honor's decree on the petition of Andrew C. Chandler et al, that certain instruments purporting to be the last will and testament and codicils thereto of said deceased dated respectively March 10, 1896, August 11, 1896, and August 9, 1902, may be proved and allowed, made at a Probate Court held at Portland, in and for said County of Cumberland, on the third day.of June, A. D. 1904, whereby certain instruments presented with said petition, dated respectively March 10, 1896, August 11, 1896, and August 9, 1902, purporting to be the last will and testament and codicils thereto of Solomon H. Chandler, late of New Gloucester, in said County, deceased, were approved and allowed as the last will and testament and codicils thereto of said deceased, and letters testamentary issued to Lyman M. Cousens, Andrew C. Chandler and John W. True, and whereby it was further decreed that the costs of the petitioners and˟ contestants, including fees of witnesses and stenographers, together with reasonable counsel fees for both said petitioners and contestants, be paid out of the estate of said Solomon H. Chandler, and hereby

appeals therefrom to the Supreme Judicial Court, being the Supreme Court of Probate, to be held at Portland, within and for the County of Cumberland, on the second Tuesday of October, A. D. 1904, and alleges the following reasons of appeal, viz:

"First : The written instruments offered by the proponents, purporting to be the last will and testament and codicils thereto of Solomon H. Chandler, dated respectively March 10, 1896, August 11, 1896, and August 9, 1902, are not, nor is either of them, the last will and testament of the said Solomon H. Chandler.

"Second : The said written instrument dated March 10, 1896 offered by the proponents, purporting to be the last will of said Solomon H. Chandler, was revoked by a subsequent and valid will duly made and executed by the said Solomon H. Chandler on the 17th day of September, 1897, he being then of sound mind and of the age of twenty-one years, which said valid will was not thereafter legally changed or revoked by said Solomon H. Chandler.

"Third : The said written instrument dated August 11th, 1896, and offered by the proponents, purporting to be a codicil to the alleged last will and testament of said Solomon H. Chandler dated March 10th, 1896, was revoked by the said Solomon H. Chandler by his said valid will duly made and executed on the 17th day of September, 1897, which said valid will was never changed or revoked by said Solomon H. Chandler.

"Fourth : The said written instrument dated August 9th, 1902, purporting to be a codicil to the alleged last will of Solomon H. Chandler, was not legally executed in the presence of three credible attesting witnesses not beneficially interested thereunder.

"Fifth : The said Solomon H. Chandler at the time of the making and executing of the written instrument offered by the proponents, dated August 9th, 1902, purporting to be a codicil to his alleged last will and testament dated March 10th, 1896, was not of sound and disposing mind.

"Sixth : Upon petition of the municipal officers of the town of New Gloucester, in the county of Cumberland and State of Maine, dated April 12th, A. D. 1902, said town then being the place of residence of said Solomon H. Chandler, representing said Solomon H.

Chandler to be a "person of unsound mind, who by reason of infirmity and mental incapacity is incompetent to manage his own estate and to protect his rights" and further praying that John W. True of New Gloucester be appointed guardian of said Solomon H. Chandler, and after due notice given to said Solomon H. Chandler on said petition as ordered by the court, and after a hearing upon the same at which said Solomon H. Chandler was present and was interrogated by the court, said Solomon H. Chandler was adjudged and decreed by the Probate Court for said county of Cumberland on May 20th, A. D. 1902, to be "a person of unsound mind." and said John W. True was appointed by said court to be the guardian of said Solomon H. Chandler, and gave bond in that behalf as ordered by said court, and under the warrant of said court caused the estate of said Solomon H. Chandler to be inventoried and appraised, and took and maintained until said Chandler's decease, custody and control of his person and estate; and said judgment and decree was not subsequently modified, annulled or reversed or vacated by said court or any court having jurisdiction in the premises; and the mind of said Solomon H. Chandler did not after the time of said judgment and decree become restored to a condition of sanity of mind and was not so restored on August 9th, A. D. 1902, the date when said alleged codicil purports to have been made.

"Seventh :  The making and execution of the written instrument dated August 9th, 1902, purporting to be a codicil to the alleged last will and testament of the said Solomon H. Chandler dated March 10th, A. D. 1896, was obtained by the undue influence of William K. Neal, John W. True and Andrew C. Chandler, exerted over Solomon H. Chandler.

"Eighth :  The said Solomon H. Chandler at the time of the making and execution of the written instrument dated August 9th, 1902, purporting to be a codicil to his alleged last will and testament dated March 10th, 1896, was unduly influenced and fraudulently deceived in the making and execution thereof by other persons or by influence other than his own mind, to wit, by persons having confidential and fiduciary relations to him and his estate, viz :  John W. True, his legal guardian, William K. Neal, attorney for the guardian, and

Andrew C. Chandler, the guardian's agent, to whom was committed the custody of his person, all of whom were then participating in the guardianship service in their several capacities for hire, and all of whom were to be benefited by the provisions of said alleged codicil, and the execution of said alleged codicil was thus procured by them.

"Ninth: The said written instrument dated August 9th, 1902 purporting to be a codicil to the alleged will of Solomon H. Chandler dated March 10th, 1896, is not the offspring of the mind and will of said Solomon H. Chandler, but is the offspring of the mind and will of another or other persons, viz., William K. Neal, John W. True and Andrew C. Chandler.

"Tenth: The said written instrument dated August 9th, 1902, purporting to be a codicil to the alleged will of Solomon H. Chandler dated March 10th, 1896, is not the act of the free will of said Solomon H. Chandler, but was procured by the fraud, deceit and undue influence of other persons to be benefited by reason thereof, viz., Andrew C. Chandler, named as legatee under said alleged codicil, John W. True, named as executor under said alleged codicil, and William K. Neal, acting as agent and attorney for said John W. True in this behalf.

"Eleventh: The making and execution of said alleged codicil dated August 9th, 1902, was not the spontaneous act of Solomon H. Chandler understanding the nature and consequences thereof, but was the act of William K. Neal and other persons advised by him.

"Twelfth: John W. True, then the legal guardian of Solomon H. Chandler, and William K. Neal, then acting as attorney and agent of said guardian, and Andrew C. Chandler, agent of said guardian to whom was then committed the custody of the person of said Solomon H. Chandler, and in whose actual custody upon said date was his person fraudulently deceived said Solomon H. Chandler and thereby procured from him the making and execution of the alleged codicil of August 9th, 1902, as a codicil to a will dated March 10th, 1896, which will they each and all then knew had been revoked by a subsequent valid and existing will, by reason whereof the contestant was defrauded of its legal rights under the provisions of said valid will dated September 17, 1897.

"Thirteenth: John W. True, then the legal guardian of Solomon H. Chandler, and William K. Neal, then acting as attorney at law, legal adviser and agent of said guardian, and Andrew C. Chandler, agent of said guardian to whom was then committed the custody of the person of said Solomon H. Chandler, and in whose actual custody upon said date was his person, practiced a fraud upon said Solomon H. Chandler in obtaining the making and execution by said Solomon H. Chandler of the alleged codicil dated August 9th, 1902, under the provisions of which they were persons to be benefitted, in that they all were present at the making and execution thereof, and they each and all then knew said Solomon H. Chandler to be a person then under guardianship by reason of the fact that he had been decreed by the Probate Court of the County of Cumberland in which he then resided to be "a person of unsound mind," and they each and all then knew that his condition of mind was such that he did not then recall the fact of the existence of or the provisions of the valid will dated September 17th, 1897; and they each and all then had knowledge of the existence of such subsequent valid last will of said Solomon H. Chandler which revoked the alleged will of March 10th, 1896 ; and they each and all then failed and neglected to recall to the mind of said Solomon H. Chandler that he had theretofore made and executed such valid will, which was subsequent to said alleged will of March 10th, 1896; and in place thereof said William K. Neal, in the pesence of and with the knowledge and consent of said John W. True, the guardian, and Andrew C. Chandler, the custodian of the person of Solomon H. Chandler, presented and read to Solomon H. Chandler the revoked will dated March 10th, 1896, as a then valid will subject to be changed by a codicil; by reason of all of which fraudulent practice the making and execution of the alleged codicil of August 9th, 1902, was obtained with the purpose and intent thus to defraud the contestant, and to so divert the testamentary disposition of the estate of said Solomon H. Chandler that they might be benefited thereby.

"Fourteenth: William K. Neal, in the presence of and with the assistance of John W. True and Andrew C. Chandler, on the ninth day of August, 1902, fraudulently deceived the said Solomon H,

Chandler, he being then under guardianship as a person of unsound mind, by falsely representing and pretending to him that the then revoked and void instrument dated March 10th, 1896, purporting to be the will of Solomon H. Chandler, of which said Neal had obtained possession by virtue of said guardianship, was his legal and valid last will and testament, and thereby unduly influenced and induced him to make pretended alterations and changes therein by the making and execution of the instrument dated August 9th, 1902, purporting to be a codicil to said alleged will dated March 10th, 1896, whereby the legal and valid will of said Solomon H. Chandler dated September 17th, 1897, of the existence of which the said William K. Neal, John W. True and Andrew C. Chandler each and all then had knowledge, would be by said Solomon H. Chandler unwittingly revoked.

"Fifteenth:   Andrew C. Chandler and John W. True are the petitioners who signed the petition as proponents for the probate and allowance by the Probate Court of the alleged will dated March 10th, 1896, and the alleged codicil dated August 11, 1896, and the alleged codicil dated August 9th, 1902, as the last will and testament of said Solomon H. Chandler, now in hearing; they are also two of the executors named in said alleged codicil of August 9th, 1902, and they are persons to be benefited thereby; and they are also two of the persons by reason of the fraud, deceit, acts, promptings and undue influence of whom, acting upon the weakened mind of said Solomon H. Chandler, the making and execution of said alleged codicil dated August 9th, 1902, was procured; and by reason thereof the decree of the court directing "that the costs of the petitioners and of the contestants in this case, including fees of witnesses and stenographers, together with reasonable counsel fees for both said petitioners and contestants be paid out of the estate of said Solomon H. Chandler by the executors and charged in their account with said estate" is unjust, without equity, encouraging and assisting the practice of frauds and deceit, and is contrary to the policy of the law.

"Dated this fourteenth day of June, A. D. 1904.

"American Board of Commissioners for Foreign Missions,
                    "By FRANK H. WIGGIN, Treasurer."

This appeal and the reasons therefor were duly entered at the said October term of said Supreme Judicial Court sitting as the Supreme Court of Probate.

At said October term of said Supreme Judicial Court, the petitioners and legatees filed a motion to have the appeal dismissed. The motion was overruled and thereupon the petitioners and legatees took exceptions. These exceptions were not considered by the Law Court.

Afterwards at said October term, of said Supreme Judicial Court, the appellant was allowed to amend its "Reasons of Appeal" by adding directly after the 15th specification therein the following averment:

"Sixteenth: And the said American Board of Commissioners for Foreign Missions avers that Frank H. Wiggin upon all the dates of taking this appeal, and of making, signing, filing in the Probate Court and entering in the Supreme Judicial Court these reasons for appeal was the duly elected and qualified and acting Treasurer of said corporation, the American Board of Commissioners for Foreign Missions; and for more than a year next preceding any and all of said dates was continuously such Treasurer; and said Frank H. Wiggin, in his said capacity as Treasurer was duly authorized by said corporation in its name and behalf to take this appeal; and to sign these reasons for appeal for and in its name and behalf; and said Treasurer, Frank H. Wiggin, in the name and behalf of said American Board of Commissioners for Foreign Missions was duly authorized to execute and procure to be executed the necessary bond for costs of appeal from said decree of the Probate Court.

"American Board of Commissioners for Foreign Missions,

By SETH L. LARRABEE,
SAMUEL C. DARLING,
FRED V. MATTHEWS,
its Attorneys."

To the ruling allowing this amendment to the "Reasons of Appeal" the appellees and legatees took exceptions, but the same were not considered by the Law Court.

Also at said October term of said Supreme Judicial Court, a

motion was filed by the appellees to strike out and expunge certain allegations in the appellant's "Reasons of Appeal."

The grounds of the motion were that the allegations objected to "were immaterial, argumentative, scandalous, not pertinent to the issue, in legal effect a repetition of allegations in other reasons of appeal, a recital of evidence only, and that they did not present any issue or allegation material to the appeal but was an attempt to raise false issues which would obscure the real issues to be tried and produce confusion and unduly prejudice the rights of the appellees in the trial of the appeal."

This motion was denied and thereupon the appellees took exceptions, but the same were not considered by the Law Court.

The cause was fully heard at said October term of said Supreme Judicial Court sitting as the Supreme Court of Probate. (The testimony, including that taken out in the Probate Court together with depositions, fills four printed volumes containing in all nearly 3000 pages.)

At the conclusion of the testimony in the Supreme Judicial Court, and in accordance with the previous agreement of the parties, the presiding Justice made the following order :

"Upon the hearing of said cause, the Justice presiding being of opinion that questions of law are involved of sufficient importance and doubt to justify the same, and the parties agreeing thereto, and in accordance with their written stipulations, the cause is, by direction of the Justice, reported to the Law Court for final determination and decision of all questions of law and fact, upon the foregoing testimony, being the evidence adduced at the hearing before the Judge of Probate, and certain additional evidence introduced before this court by deposition and oral testimony, or so much thereof as may be deemed legally admissible."

The wills and codicils under consideration in the case and other facts material to the issue, sufficiently appear in the opinion.

Solomon H. Chandler, the deceased testator, appears to have been commonly known as Hewett Chandler and is frequently spoken of by that name in the testimony, a part of which is quoted in the opinion.

Catherine C. Chandler, one of the legatees, is called Madam Chandler both in the testimony and in the opinion.

The case does not disclose the exact amount of the deceased testator's estate, but the appellant's brief refers to the codicil of August 9th, 1902, as disposing of " nearly half a million of dollars."

The appellant's brief consists of 985 printed pages, besides indexes, etc., and the appellees' brief covers over 600 printed pages.

*Seth L. Larrabee, Samuel C. Darling* (of Boston, Mass.), *Fred V. Matthews, and S. Boyd Darling* (of Boston, Mass.), for appellant.

*Nathan and Henry B. Cleaves and Stephen C. Perry and Guy H. Sturgis*, for appellees, also for Andrew C. Chandler, Charles P. Chandler, Fred H. Chandler, Roland C. Chandler and Catherine C. Chandler, legatees.

*Josiah H. Drummond*, for executors.

SITTING: WISWELL, C. J., WHITEHOUSE, STROUT, SAVAGE, POWERS, SPEAR, JJ.

SPEAR, J.   This is an appeal from the decree of the Judge of Probate of Cumberland County approving and allowing the last will and testament and codicils thereto, of Solomon H. Chandler.

The cause is " reported to the Law Court for final determination and decision of all questions of law and fact, upon the foregoing testimony, being the evidence adduced at the hearing before the Judge of Probate, and certain additional evidence introduced before this court, by deposition and oral testimony, or so much thereof as may be deemed legally admissible."

On the tenth day of March, 1896, Mr. Chandler executed a will by which after providing for the payment of the usual expenditures and appropriating a sum not exceeding $500 for the erection of a monument, he directed the disposition of his property as follows :

"Third :   I give, bequeath and devise all the rest, residue and remainder of my estate, real, personal and mixed, wherever found and however situated, intending to include in this provision all property I now have and all which may hereafter be acquired by me, and any rights and interests in and to any property which I may

have at the time of my death though not reduced to my possession at that time to the American Board of Commissioners for Foreign Missions, a corporation duly established by the laws of the Commonwealth of Massachusetts and having an office and place of business in Boston, in the County of Suffolk and Commonwealth of Massachusetts, for the following uses and purposes, and for none other, that is to say to invest and re-invest the property which said Board may acquire under this provision, and all sums of money which may be received by said Board of Commissioners as premiums from the sale of any of the securities which may come to said Board of Commissioners under this provision as well as all sums which may be received as premiums by said Board of Commissioners by reason of the investment and re-investment of any of the funds received by them from my estate or the accumulation thereof in such a manner as will yield a fair annual income, having regard more for the safety of the funds than for the amount of the income that may be realized therefrom, and said Board of Commissioners are to apply and use from year to year, the income of said rest, residue and remainder and the income of such portions of said principal sum as may remain from year to year, together with such portion of the principal as added to such yearly income will make the sum of thirty thousand dollars per annum for four years and after the expiration of said four years such income and such portion of the remainder of said principal as added to such income will make a sum of twenty-five thousand dollars per annum until the full amount of the said principal sum and the income therefrom shall have both been expended for the general purposes and objects of said Board, but upon the following conditions that none of the property which said American Board of Commissioners for Foreign Missions shall receive from my estate under these provisions and none of the income which said Board, or its successors or assigns, may derive from such property shall ever be expended towards the reduction of the indebtedness of said American Board, or their successors or assigns, and that none of the aforementioned principal or interest shall ever be used to defray any of the running expenses of said society, but shall be wholly expended for purely missionary purposes, It is my wish and preference that the funds

which the said American Board of Commissioners for Foreign Missions may receive under the provisions of my will shall be conscientiously expended for the advancement of the cause of Christ in those foreign lands and mission fields where, in the judgment of said American Board, the most good can be accomplished."

He appointed Andrew C. Chandler and John H. Card as executors of this will.

On the 11th day of August 1896, he made a codicil by which he appointed Lyman M. Cousins as an additional executor, making no other change in the will.

On the 17th day of September 1897, Mr. Chandler made a further will providing as in the will of 1896 for the payment of the ordinary expenses of administration and directing the erection of a monument and made a change in the executors appointing Lyman M. Cousins and Henry P. Cox. The third clause in this will was identical with the third clause in the will of 1896 above quoted except the omission of the two words " of any," clause three in the will of 1896 reading "investment and reinvestment of any of the funds," and clause three of the will of 1897 reading "investment and reinvestment of the funds." It is apparent that the omission of these two words in the connection in which they were used made no difference, whatever, in the identity of meaning of these two clauses in the two wills. The fifth clause of the will of 1897 simply provided for an early settlement of the estate.

On the ninth day of August, 1902, Mr. Chandler made a codicil to the will of March tenth, 1896, which omitting formal parts provided as follows :

" I hereby ratify and confirm as and for my last Will and Testament the instrument made and executed by me March tenth A. D. 1896 and the codicil thereto dated August eleventh, A. D. 1896, with the exception of the following provisions and changes in the disposal of my estate.

" Believing that it is right and proper for me to give to my next of kin some portion of the estate belonging to me at time of my decease, a large share of which was received by me from the estate.

of my deceased father, Solomon Hewitt Chandler, I make the following devises and bequests.

"First: To each of the sons of my deceased brother Andrew C. Chandler, my nephews Andrew C. Chandler, Charles P. Chandler, Fred H. Chandler, and Roland C. Chandler, all of New Gloucester, I give, devise and bequeath one tenth part of all the estate belonging to me at time of my decease, after the payment of all sums required under the provisions of the first and second items of my said will. To have and to hold to them and each of them and their heirs and assigns forever.

"Second : I give and bequeath to Catherine C. Chandler, widow of my deceased brother Andrew C. Chandler, if she is living at time of my decease, one tenth part of all my said estate in remembrance of her continual acts of kindness towards me during the many years I have made my home in her family.

"Third: I give and bequeath unto Sara Archer Chandler, child of my nephew Andrew C. the sum of five hundred dollars, as a token of my regard for her, she having received her name at my suggestion and request.

"Fourth: If either of the persons named in this codicil as devisees and legatees is not living at the time of my decease I give, devise and bequeath the share and portion of my estate which would be received by such one if then alive to the children of the deceased legatee, in equal shares and portions, to have and to hold to them and their heirs and assigns forever.

"Fifth : I hereby confirm the appointment of Lyman M. Cousens and Andrew C. Chandler as executors of my will, and this codicil thereto, and I revoke the appointment of John H. Card as such executor, and in his place and stead I nominate and appoint John W. True of New Gloucester, as one of the executors thereof, and I request and direct that no bond be required of him in that capacity by the Judge of Probate having jurisdiction of my estate.

"Sixth : I hereby revoke and annul all wills by me at any time made and executed, excepting the will first mentioned herein."

Solomon II. Chandler died on the 31st day of December 1903. On the 22nd day of January 1904, Andrew C. Chandler and John

W. True, two of the executors named in the codicil of August ninth, 1902, filed a petition in the Probate Court for the county of Cumberland, dated Jan. eighteenth, 1904, praying for the proof and allowance of the will of 1896 and the codicil thereto, including the codicil of August ninth, 1902, and that letters testamentary issue to Lyman M. Cousens, Andrew C. Chandler and John W. True the executors therein named. This petition was resisted by the American Board of Commissioners for Foreign Missions, and, upon full hearing the Probate Court entered a decree that the will of 1896, and the codicils thereto, be approved and allowed as the last will and testament and codicils thereto of said deceased, and that letters testamentary issue to the several persons therein named as executors. From this decree, the American Board appealed filing fifteen reasons therefor.

At this point it is proper to add that, in the space which could properly be given to the longest opinion, it would be both useless and impossible to undertake any connected analysis of the testimony and evidence presented in this case containing, as it does, 3000 printed pages besides numerous exhibits not printed, and argued by the appellant in a brief of 985 printed pages besides indexes, and by the appellees in a brief covering over 600 printed pages. The great volume of these arguments which are not only very able, but also logical and concise, as a complete analysis of the great mass of testimony would permit, establishes the futility of any attempt on the part of the court to follow out the various branches of the controversy, unprecedented in the mass of material involved.

We desire, however, to acknowledge our appreciation of the great assistance the arguments have afforded us in considering the case, not only by reason of their masterly discussion and analysis, but by presenting complete indexes of the witnesses and cases cited, and a thorough digest, chronologically and topically arranged, of every material piece of testimony. While these helps have not relieved us of the laborious task of reading the testimony, they have been of inestimable value in enabling us to collate and compare it.

Notwithstanding the voluminous testimony and the large sum involved, yet, in the propositions of law and fact governing its consideration, this proceeding may be resolved into the ordinary will case,

presenting only the usual questions raised in such contests, and must be decided upon its own peculiar circumstances and facts. The appellants filed fifteen reasons of appeal but in their brief they say, "the issues raised by these separate reasons of appeal will all be considered in argument under the general subdivisions of testamentary capacity, undue influence and fraud." We adopt this classification.

Therefore the first and perhaps the most important questions for our determination is, did Solomon H. Chandler, on the ninth day of August 1902 possess such soundness of mind, as, in contemplation of the law, enabled him to make a valid disposition of his estate by will? At this time our statute provided that "a person of sound mind and of the age of twenty-one years may dispose of his real and personal estate by will." There is no exception or qualification to this requirement that a person must be of sound mind to make a valid will. The burden rests upon the proponents to affirmatively prove it. In probating a will the sanity of the testator must be proved and is not to be presumed. These principles are too well established in this state to require citation. But the word sanity is used in its legal and not its medical sense.

In *Johnson* v. *Maine & N. B. Ins. Co.*, 83 Maine, 186, Mr. Justice EMERY speaking for the court says: "Etymologically, insanity signifies unsoundness. Lexically it signifies unsoundness of mind, or derangement of the intellect. Medical science with its usual zeal has deeply investigated the various forms, symptoms, causes, results and manifestations of mental unsoundness, or disease, and has discovered numerous kinds of such diseases to which it has given appropriate technical names. Dr. Hammond (Late Surgeon General United States Army,) for instance, classifies these kinds into seven classes, and thirty-three sub-classes (not claiming this to be a natural classification.) Dementia and mania are both specified in this classification. But however necessary such an analysis and classification of mental diseases may be to the science of medicine, they are impracticable and unnecessary in legal science. In law, every mind is sound that can reason and will intelligently, in the particular transaction being considered; and every mind is unsound or insane that cannot so reason and will. The law investigates no further." This

definition clearly differentiates the sound from the unsound mind, in the legal sense.

In *Hall* v. *Perry*, 87 Maine, 572, Mr. Justice WHITEHOUSE, in delivering the opinion of the court, goes a step further and defines those faculties of the mind whose presence are essential to verify the existence of testamentary capacity in the testator : " A ' disposing mind' involves the exercise of so much mind and memory as would enable a person to transact common and simple kinds of business with that intelligence which belongs to the weakest class of sound minds; and a disposing memory exists when one can recall the general nature, condition and extent of his property and his relation to those to whom he gives, and also to those from whom he excludes, his bounty. He must have active memory enough to bring to his mind the nature and particulars of the business to be transacted and mental power enough to appreciate them and act with sense and judgment in regard to them. He must have sufficient capacity to comprehend the condition of his property, his relations to the persons who were or should have been the objects of his bounty, and the scope and bearing of the provisions of his will. He must have sufficient active memory to collect in his mind, without prompting, the particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least, their obvious relations to each other, and be able to form some rational judgment in relation to them. . . . . But mere intellectual feebleness must be distinguished from unsoundness of mind. The requirements of a "sound and disposing mind" does not imply that the powers of the mind may not have been weakened or impaired by old age or bodily disease. A person may be incapacitated by age, and failing memory, from engaging in complex and intricate business, and incapable of understanding all parts of a contract, and yet be able to give simple directions for the disposition of property by will." For an exhaustive review of the authorities upon this point, see *Delafield* v. *Parish*, 25 New York, 9.

In speaking of the testatrix in this particular case, Mr. Justice WHITEHOUSE further says: "She may have been childish, changeable, impatient and sometimes inconsiderate; her judgment in relation to

the value of property may not have been the most reliable, and her mind may not have been vigorous enough to grasp all the features of a complicated transaction ; but all this may be said of multitudes of elderly people whose competency to manage simple and ordinary kinds of business is never questioned by their acquaintances and friends. ' Weakness of memory, vacillation of purpose, credulity and vagueness of thought, may all consist with adequate testamentary capacity under favorable circumstances.' " Schouler on Wills, section 70.

Our court have also said in *Randall & Randall, Appellants*, 99 Maine, 398, " If the testator possesses so much mind and memory as enables him to transact common and simple kinds of business with that intelligence which belongs to the weakest class of sound minds, and can recall the general nature, condition and extent of his property, and his relations to those to whom he gives, and also to those from whom he excludes his bounty, it is sufficient."

Under these legal principles arises a pure question of fact upon the first proposition, which it is incumbent upon the proponents or appellees in the first instance to prove, namely, that the testator on the ninth day of August, not the eighth nor tenth nor any other day, was possessed of testamentary capacity. Under our statute, the question of age being eliminated, the only standard as to such capacity is whether the testator was of "sound mind," as this phrase is used in its fixed legal meaning. That is, had he on that day, at the time the codicil was executed, the capacity to make *a* codicil not *the* codicil, produced. If he had, the codicil in question should be sustained. If he had not, the codicil should fail. As said in *Delafield* v. *Parish*, 25 New York, at page 97, under a statute similar in principle to ours, " the question in every case is, had the testator, as compos mentis, capacity to make a will ; not, had he capacity to make the will produced. If compos mentis, he can make any will, however complicated ; if non compos mentis, he can make no will—not the simplest." Likewise, Mr. Chandler, if of sound mind, in the legal sense, could have made any codicil, and consequently the one under consideration.

In assuming the burden of proof, upon this proposition, which

requires only a preponderance of the evidence as in civil actions, the proponents of the will and codicil of 1902 present, first, as evidence of the testamentary capacity of the testator, the internal proof furnished by the terms of the codicil itself. Under the will of 1896 republished, as under that of 1897 revoked, Mr. Chandler had bequeathed practically all of his extensive estate to the American Board. In fact, he had not disposed of any of it by either of these wills in favor of any of his relatives. It appears that the nucleus of his great fortune was derived from his father, a direct ancestor of the nephews, who were recognized in the codicil of August ninth. By this codicil he diverted about one-half of his large fortune, substantially all of which would have been transmitted by his will to the American Board, from it to his relatives above named.

If the other evidence in the case affords satisfactory proof that, at the time the above codicil was made, the testator was not possessed of testamentary capacity, then, of course, the internal evidence from the terms of the codicil, itself, is of no value, as it was not the testator's will. On the other hand, if such evidence does not amount to such proof, then the internal evidence is material, and may become important. While the question of testamentary capacity under the evidence, aliunde the internal proof, is a very close one, yet we are inclined to the opinion that it does not preclude the proponents from the right to have considered the internal evidence of the terms of the codicil. This evidence is plainly in harmony with what we should expect to be the rational and natural instinct of the testator. The character of the codicil therefore in this case becomes significant. It manifests a rational act. Its provisions are just, reasonable and natural, in harmony with natural justice, and have a tendency to prove a normal state of mind.

Gardiner on Wills, Hornbook Series 1903, page 136, speaking of this class of evidence says: "In determining the question of competency, the character of the will itself is extremely significant. A rational act, rationally done, is convincing proof that a rational being did it. 'The strongest and best proof that can arise as to a lucid interval is that which arises from the act itself'. Indeed, sometimes the intrinsically reasonable character of a will gives rise to a pre-

sumption that it was executed during a lucid interval, though the
testator be chronically insane. So, if the provisions of the will are
just, reasonable and natural, they point towards a normal testator."
In *Barker et al.* v. *Comins et al.*, 110 Mass. 477, the court say:
" Where the will is unreasonable in its provisions and inconsistent
with the duties of the testator with reference to his property and
family, it furnishes some ground which the jury may consider upon
the question of loss of memory, undue influence and other inca-
pacity." Our court has recognized these principles in *Wells, Appel-
lant*, 96 Maine, 164.

The next evidence presented by the proponents to prove the testa-
tor's testamentary capacity was that of the persons who witnessed the
execution of the codicil. At this point we shall consider only such part
of the testimony of the subscribing witnesses, as bears upon the testa-
tor's soundness of mind. Their testimony as to undue influence and
fraud will be considered under those heads respectively. The wit-
nesses to this codicil were William K. Neal, Margaret McGlinch and
Minnie M. Morse. Mr. Neal, a well known lawyer of Portland, drew
the codicil upon the date of its execution, having had some weeks
previously a conversation with Mr. Chandler with respect to it, in
his office in Portland. Before drawing the codicil Mr. Neal called
upon Mr. Chandler in New Gloucester, and, as he testifies, asked
him if he had thought over the matter that they talked of in Port-
land a short time ago. Mr. Chandler said he had, although Mr.
Neal did not speak of the business as pertaining to the will. Mr.
Neal then went into Mr. Chandler's room in company with other
parties and there had some conversation with him upon general
topics, and later asked him again if he had thought over the matter
which had been talked of in Portland before, and if he had concluded
what to do, and he said he had. After more conversation, Mr. Neal
produced the will of 1896 and the codicil attached to it, and read it
to Mr. Chandler. Mr. Neal says " and after I got through reading
I remember one remark which he made as I finished the reading.
" Well, he said, I don't think that John H. Card is much of a fellow,
do you ? and I think the answer I made was, perhaps you might
have selected somebody else for executor who would be better ; and

he said, will you read that again and I read it the second time."

This remark with reference to Mr. Card and the request to have the will read again, are in accord with the existence of memory and understanding. The, remark shows that he recalled what he, at least, considered defects in the capacity or qualifications of Mr. Card for the important trust of executor. The request for the re-reading of the will is evidence of a desire to comprehend and understand it.

Mr. Neal then asked him what he had concluded to do and he answered, well it is rather natural that I should give them something, is it not, and I think it would be right, I think that was very nearly his exact words. Then after some more conversation Mr. Neal inquired how much he desired to give. As the character of this testimony is very important we give Mr. Neal's answer in full to the following question. Q. You stated that you went to his desk and made a memorandum. A. No, I went to the desk and got a piece of paper and made a memorandum, and I said then, how much, and he said he hadn't quite made up his mind how much; and that matter was—then I think I said this, as I recall it,—will you make it a specific sum or make it some per cent of the amount which you leave. And he sat and thought the matter over apparently, and he said he thought about ten per cent for each one; and I made the memorandum giving the names of the four nephews, and I think Mr. True gave me their full names, and I carried out against the name one-tenth; and then as I recall it Mr. True asked something in regard to whether he wanted Mrs. Chandler to have any part of the estate; and then the matter of his having lived in the family for so many years was spoken of; and he said, yes, I will give her the same as the rest; and then I think the next thing, as I recall it now, was, I said, in case any of these parties should die before you do, Mr. Chandler, what disposition do you want made of these legacies?

Q. That was your suggestion to him? A. That was my question; and do you want it to go back into the estate, or what should be done with it; and he said, give it to the children.

During this interview the will and codicil of 1896 were twice read to Mr. Chandler by Mr. Neal and from the testimony of Mr. Neal it

would seem that he understood them; at least nothing appears in the interview, with respect to Mr. Chandler's disposition to make a change in his will, to indicate the contrary.   Mr. Neal drew up the codicil of August ninth at Mr True's house at noon.   He had no conversation with Mr. True as to the provisions of the codicil nor with Andrew Chandler nor Charles P. Chandler.   He returned to Mr. Chandler's room in the afternoon with the codicil prepared. What was then done will be shown by the following question to Mr. Neal and his answer:

Q.   Now, if you will state the conversation which took place between you and Mr. Chandler when you returned with this paper?

A.   After we sat down, I produced this paper and read it aloud, and Mr. Chandler was sitting facing me near his desk; and when I had finished it he said, well, that is just right, that is just as we talked this morning; and I said, I tried to make it that way, and I folded it up and handed it to Mr. Chandler, and I said, you want to keep that and think it over, and the first time you come down to Portland drop in and if it is all right we will fix it up; and his answer to that was, it is all right and why not fix it today.   And I said, if you prefer to do that of course I can do it now just as well as then.

Mr. Neal also said in response to a question that Solomon H. Chandler on the ninth day of August 1902 was in his opinion in the possession of mental capacity sufficient to transact business and with an intelligent understanding of what he was doing; and also that he had had an acquaintance with the testator more than twenty-five years.

We have quoted thus fully from the testimony of Mr. Neal as his evidence constitutes the citadel of assault against which the appellants hurl the force of their attack.   From all the admissible testimony of Mr. Neal, fairly considered, his evidence adequately proves a legally sound and disposing mind in the testator on the ninth day of August 1902.   That he might have had days, immediately preceding or soon following this date, when his mind was not sufficiently clear, to enable him to comprehend all the relations which the law requires he should understand, in order to make a valid will, may be

true. But the testimony of Mr. Neal if true proves that the mind of Mr. Chandler on this day, although slow and unquestionably impaired from age, and possibly by the insipient stages of disease, was nevertheless working with an intelligent and comprehensive understanding as to the subject matter under consideration. The evidence clearly shows that Mr. Chandler was a silent, deliberate, reticent man with respect to all his business affairs. He did not discuss them in the family nor with the neighbors. He had said nothing about his intended change in his will, but the evidence shows that when Mr. Neal called upon him, weeks after this matter had been discussed in his office in Portland, Mr. Chandler had been thinking about it. Without restraint or influence of any kind when approached a few weeks later upon the subject, he at once comprehended what had been said before in the office and had come to his own conclusion, absolutely free from any suggestion in the meantime, to distribute a portion of his estate among his next of kin. Now this silent deliberation of two or three weeks and the determination to which he at once had come, when asked with respect to it, to divert a part of his estate to his relatives, was in complete harmony with the characteristics of Mr. Chandler and the manner in which we should expect him to act, if in a normal condition of mind.

The conclusion to which Mr. Chandler came, after deliberating upon the matter from the time of the interview in Portland until the ninth day of August, in response to the question as to what he had made up his mind to do, was so aptly, tersely and naturally expressed, as to show a clear comprehension of the relation of those, whom he was about to make the objects of his bounty: " Well, it is rather natural that I should give them something, is it not, and I think it would be right." It *was* natural and it *was* right. What more could be said? What more would one expect Solomon H. Chandler, in view of his characteristics as disclosed by the testimony, to say? What expression could better describe the apparent duty of the testator? Fairly analyzed, this declaration of his seems to have comprehended the whole situation embraced in the transaction of August ninth. The testator and his brother, the father of the nephews, had accumulated and owned their property jointly, until the death of the

brother Andrew in April 1894. A portion of the joint property came to Andrew and Solomon Chandler by inheritance from their father, the grandfather of the nephews, who were made legatees under Solomon's codicil. Madam Chandler, his sister-in-law, another legatee, was the widow of his deceased brother, Andrew. For him she had made a pleasant home the greater part of his life, until ill health had compelled her to surrender the further discharge of the duty which she, for so many years, had cheerfully performed. When this necessity required a change of domicil for Mr. Chandler, he did not seek the company of strangers but made his new abode in the home of his nephew, Andrew, a member of the Chandler family with which he had been closely identified from boyhood. He entertained pleasant relations with all of his nephews and had said in his interview in Portland that they were reliable, likely men. He himself had become old, decrepit and broken. His body was weak and his mind was failing. He was undoubtedly aware of his condition. From the activities of a shrewd business life, with his thoughts and energies engrossed in the details of managing a large and growing property, he had, in obedience to the mandate of old age, become relieved of these exacting duties ; and his mind, though impaired, had an opportunity to meditate upon other matters than the accumulation and management of wealth. It is an instinct of old age, when ambition has laid aside the cares of life, to revert to the days of one's youth, to call up the memories of the past, to reflect upon family relations and to ponder upon the duties which these new thoughts awaken. When Solomon Chandler's attention was called to the fact that he had entirely overlooked all of his next of kin in the distribution of his large estate, we feel convinced that, true to this instinct, he also reflected upon the manner in which the basis of his fortune had come to him ; the relations of his brother, his nephews and his sister-in-law, and gave expression to that reflection in the phraseology already quoted, "Well, it is rather natural that I should give them something, is it not, and I think it would be right."

From all the facts and circumstances surrounding the life of Solomon H. Chandler and this codicil of August ninth, we think the reasons which he gives for his action, is ample proof of his

understanding and comprehension of his act and, in the legal sense, of his soundness of mind.

The next witness to the codicil in question was Miss Minnie M. Morse. She was, on August ninth, acting in the capacity of a nurse for Madam Chandler who was at the time ill, and was called from Madam Chandler's room into that of Solomon's with the express purpose of becoming a witness to the codicil. The effect of her testimony is that, in her judgment, Mr. Chandler knew what he was doing when he signed the codicil. She said that Mr. Neal asked him if he understood fully the codicil, and if it was done in accordance with his dictation and as he wanted it, and Mr. Chandler said he did. The last witness was Miss Margaret McGlinch who had long been a servant in Madam Chandler's family. The effect of her testimony is that from 1900 down to August ninth, 1902, she observed that Solomon was growing older and weaker physically but she did not observe any peculiarities of mind nor incoherence of thought but that he was forgetful. She did not recall any others. These witnesses substantially corroborated the testimony of Mr. Neal as to the mental condition of Mr. Chandler on the ninth day of August, 1902. We do not deem it necessary to further refer to their testimony at the present time as we are now discussing only the evidence offered in proof of the execution of the codicil, and the testamentary capacity of the testator.

The only other witnesses present at the interview and at the execution of the codicil, were John W. True and Andrew Chandler, Mr. True corroborates the testimony of Mr. Neal as to what was said and done upon these occasions, and, while Mr. Chandler does not remember all the conversation as testified to by Mr. Neal and Mr. True, he does not deny that it occurred substantially as they have related it. His testimony clearly demonstrates that he must necessarily either have not heard or forgotten parts of the conversation which took place at the execution of the will. He does, however, recollect some of the conversation and particularly that, in case any of the legatees or nephews died, their share would go to their children. He also says that the testator talked intelligently and that he appeared to understand what he was talking about. Andrew

Chandler was his attendant and, from his relation to him, necessarily had a very intimate knowledge of the workings of his mind from day to day, and from time to time. He was, perhaps, better able to determine than almost any other person, whether at the execution of this codicil, he talked intelligently and comprehended what he was doing. While his testimony comprises nearly two thousand questions, yet, the vital part of it, with respect to the testamentary capacity of Solomon H. Chandler on August ninth, is included within the few sentences in which he says, on that day, he talked intelligently and appeared to understand. Andrew Chandler says that Solomon's mind was mixed at times, upon some matters and clear upon others; that he was more confused on some days than others, but that these confused spells passed away.

Whatever his condition of mind before or after the ninth day of August, its only bearing upon the issue here involved is its tendency to prove or disprove the mental capacity of Mr. Chandler on that date. Whether he was upon any particular day before August ninth, or upon any particular day thereafter, mentally incapable of making a will, is not the question. Was he capable on that day? Andrew Chandler's testimony indicates that he was.

Mr. True's testimony upon two propositions of fact which occurred on August ninth, connected with the preparation and execution of the codicil in question, is positive and very important. It distinctly shows the clearness of Mr. Chandler's mind upon the matter of the codicil. The testimony is so decisive that we deem a few questions and answers worthy of quotation. With respect to the amount he desired to give to each of his nephews, Mr. True a witness for the contestants, in answer to his own counsel, testified as follows: Q. I will ask you just once more; this is an *important point,* I want you to try and recollect, was Mr. Neal's remark that it would be proper for him to divide ten per cent among them, or something less? A. You could either give a lump sum or make it a percentage five or ten per cent or more or less. Q. That is all he said? A. That is all he said. Q. Now Mr. Hewitt Chandler replied to that what? A. I guess ten per cent will be about right. Q. What further was said? A. Mr. Neal said, ten per cent to each?

and he said, yes, to each one. Q. Now Mr. True are you positive that the next question asked by Mr. Neal was whether Mr. Hewitt meant ten per cent to each nephew or ten per cent to all of them? A. Yes sir. Q. He said ten per cent to each? A. Yes sir. Q. And what did Hewitt answer to that? A. He said yes, ten per cent to each, repeated. Q. Did he use the word yes, or look at Mr. Neal as you are looking at me, did he merely nod his head? Now I want your best recollection sir. A. My best recollection is that he said yes, repeated the ten per cent to each. Q. Said yes, ten per cent to each? A. Yes sir, that is my best recollection. Q. You don't think there was any nodding of the head at all? A. No sir, not in that case. Q. But spoken words? A. Yes sir. Q. Yes, ten per cent to each. A. Yes sir.

The next important point is the testimony of this same witness with reference to the time of signing the codicil. After Mr. Neal had read the codicil to Mr. Chandler, he laid it upon the roll top desk and said he could look it over and if it was satisfactory, or if it was all right, he could sign it at some later time. To this suggestion, Mr. Chandler answered, " That is all right and why not fix it today," or " why not fix it now?" These two propositions of fact are as well established as human testimony can do. The declaration of the testator as to the amount he desired to give was made in the forenoon, and that stating that the codicil was all right and why not sign it now, in the afternoon, the two covering the whole period from the taking of the minutes for the preparation of the codicil to the time of its execution. If there is anything in the conduct or conversation of Mr. Chandler, during this period, that indicates an unsound mind in the legal sense, we fail to discover it. On the other hand, both of these transactions indicate a lucid mind as to the business being transacted, and a comprehension and understanding of what he himself was doing. He seems to have said all that was necessary upon both points, and to have said it clearly.

His statement, we again repeat, that the codicil was as they had talked in the morning and that it was all right and why not sign it now, not only evidenced the exercise of the functions of memory as to what had occurred, but a comprehension of the import of the

morning conversation; that it was for the purpose of making a change in his will and that, to be effective, it must be signed. In other words, when this codicil was read to him, by the operation of the law of association, that mysterious power of the intellect that produces a "consecution of mental states," his mind ran back over the ground of the previous interview, remembered the talk in the morning, comprehended the object of it, and understood that the codicil embraced it.

There is another fact brought out in the testimony of Andrew Chandler which we deem conclusive as showing not only the exercise of memory but of original thought. Either upon the afternoon of the execution of the codicil, or the next day, he said of his own volition " we " or " I have left Margaret out." Margaret had long been a faithful servant in the family of the brother and sister-in-law, with whom he had spent the most of his life. But especially in his later days, when the feebleness of old age and mental decline were creeping upon him, and greater care was necessary to his comfort, undoubtedly the fidelity of Margaret, who had administered to him at this time so well, had impressed itself upon his appreciation, and what more natural or rational than he should think of her in the distribution of his favors. And more important than all is the necessary inference from an analysis of the mental operation which produced the thought of Margaret. To discover this, we have but to recall the expression, " I have left Margaret out." Out of what? Out of the codicil. His mind must necessarily have conceived something from which she was left out. What was he thinking of when he gave utterance to this expression? There can be but one rational answer. He recalled that he had modified or changed his will; that he had made his nephews and his sister-in-law beneficiaries under the change; that he had given his grand niece $500; he recalled some or all of these things first, and then came the reflection that he had omitted this faithful servant, had " left Margaret out."

It can be said of this incident as was said in *Wells, Appellant,* 96 Maine, 164, " It frequently happens that the most satisfactory evidence of a person's real state of mind is to be gathered from the

mind's own action as shown by his conversation, claims, declarations and acts. Proven facts of this class carry greater weight than the opinion of witnesses." His evident anxiety and repeated inquiries after Madam Chandler's health, upon this day, are also significant, and show both the existence of memory and the emotion of solicitude.

We have now substantially reviewed the evidence of all the witnesses who had the opportunity of any personal knowledge, worth noting, with respect to the mental condition of Mr. Chandler on the ninth day of August 1902. Under the legal principles established by our court and embodied in the first part of this opinion, we are unable to say, upon the testimony reviewed, that Mr. Chandler was not of sound mind on the ninth day of August 1902. On the other hand, we think this evidence quite conclusively shows that he was of disposing mind on that day. We think an examination of the report will show the fact that no witness called, either by the proponents or contestants, has testified to a single act or word on the part of the testator on the ninth day of August which is not entirely consistent with the existence of testamentary capacity.

But it should be remarked that we have thus far confined ourselves to the testimony relating to this single day. Now arises the question whether the other testimony, volumes of which have been taken with respect to his mental condition before and after this date, fairly warrants the inference that, in view of his condition before and after, he must, at this time, necessarily have been of unsound mind. The appellants take the affirmative of this proposition and confidently assert that the evidence sustains it. The proponents of the will and codicils must sustain the burden of proof of the testator's mental capacity, not only upon the evidence of August ninth, but upon all the evidence in the case, and if, upon all the evidence they have failed, then the appeal must be sustained.

The report of the evidence requires the court to determine this case upon so much of the testimony reported as is legally admissible. We feel at this time constrained to say that this restriction eliminates at least quite a part of the testimony upon which the contestants rely to overthrow the contention of the testator's responsibility when

he executed the codicil.   The admissible and the inadmissible are so interlaced that it would be almost an endless task to separate the wheat from the chaff.   We have endeavored, however, in our investigation to give a liberal interpretation to the rule of admissibility.

We shall be able to discuss the volume of testimony bearing upon the different phases of this case only by grouping it under certain heads and referring to it in that form.   The first proposition which the appellants assert in derogation of Mr. Chandler's mental capacity is the contention that he was, at the time of executing the codicil, under legal guardianship and consequently incapable of making a will, unless the restoration of his sanity be proved beyond a reasonable doubt.   But such it not the law.   It is a well established rule in this state, and we think in most others, that while confinement in an insane asylum, or the disability of guardianship, is made prima facie evidence of some mental incapacity, it is a rebuttable presumption of fact and may be overthrown by a preponderance of the evidence.   Of course it is evident that a greater or less amount of evidence may be required to overcome this presumption, depending upon the nature and extent of the incapacity of the person under guardianship, and varying with the circumstances of the case.   As was said in *May* v. *Bradlee*, 127 Mass. 414, a case where the testator at the time of making his will had been under guardianship as non compos for twenty-six years, "the testator was under guardianship and that implies some degree or form of mental unsoundness. The issue at the trial was whether that unsoundness amounted to testamentary incapacity."

As we interpret the law the incapacity of guardianship is simply a fact which may be proven like any other fact tending to establish mental incapacity, but it does not work an estoppel upon the proponents.   The law recognizes that a person may require a guardian by reason of incapacity in one particular, while, in other respects, he may be entirely competent.   It is well settled that a man may be of unsound mind in one respect and not in all respects; that there may be partial insanity of the testator, some unsoundness of mind, that does not in any way relate to his property or disposition of the same by will.   Chapter 69, R. S., recognizes this principle and provides

in part; " When a person over twenty-one years of age is under guardianship, he is incapable of disposing of his property otherwise than by his last will." Therefore any presumption of testamentary incapacity arising from a decree of unsound mind, may be overcome by testimony as to the facts and circumstances. connected with the execution of the instrument, as was held in *Halley* v. *Webster*, 21 Maine, 461, in the instructions to the jury, " that if they were satisfied that previous to the execution of the will the deceased was of unsound mind and memory, the burden of proof would be upon the proponent to prove that at the time of executing it he was of sound mind and memory, and also, that the lowest share of mind and memory, which would enable a person to transact the ordinary business of life with common intelligence, would be sufficient to answer the requirements of the law that he should be of sound and disposing mind and memory."

Under our statute and the decisions of our own court, the only burden upon the proponents of a will to overcome the disability imposed by guardianship, is to prove by a preponderance of the evidence that the testator at the time of executing the will was of sound mind, in the legal sense. As before intimated, if the guardianship was imposed on account of the impairment of some particular function of the brain which did not materially interfere with the judgment, comprehension and memory, it might require scarcely any evidence at all to remove the effect of it. On the other hand, if it was imposed on account of long standing and chronic insanity involving the destruction of all these faculties, no amount of evidence could overcome it.

Of the impairment of the mind between these two extremes, the amount of evidence required to overcome the disability, would depend upon the facts and circumstances of each particular case; so that when we reach the final determination as to mental capacity or incapacity, whether the person is in an insane asylum, under guardianship, or under no legal disability, we revert to the simple proposition of law whether, under all the circumstances in the particular case under consideration, the testator was of sound and disposing mind. The proof must be sufficient to overcome all disabili-

ties, however originating and however imposed. When the proponents have sustained the burden of proof upon this proposition, it matters not how the obstacles to be overcome were created.

Upon this contention, the contestants must fail, as the evidence relating to the mental condition of Mr. Chandler on the ninth day of August, 1902, and which has led us to conclude upon this particular evidence that he was on that day of disposing mind, has in no way been impaired by the mere fact, that several months earlier the testator was placed under legal guardianship. We come to this conclusion, regardless of the claim of those immediately interested in procuring guardianship that it was on account of Mr. Chandler's physical condition, upon the assumption that the decree of guardianship is a legal judgment and conclusive upon the facts therein recited.

The two next groups of evidence, that of the neighbors and friends of Mr. Chandler, and of the medical experts, will be considered upon the same proposition, namely; do they show that the mind of Mr. Chandler, before and after August ninth, had approached such a state of decay that, notwithstanding the evidence of those who observed him personally and witnessed, with their own eyes, his appearance, manner and conduct at the execution of the codicil, the inference must be drawn that he was upon that day of unsound mind, in the legal sense, notwithstanding his apparent mental capacity.

First, we will consider the testimony of the neighbors and friends. Of these there are upwards of one hundred and twenty. We shall allude principally to the character of their testimony without attempting to discuss it in detail. It is evident from the record that the death of Mr. Chandler, the disposal of a portion of his property by the execution of a codicil, at a time when it was generally known that he had become enfeebled by age and disease, and a contest over the validity of this codicil involving nearly half a million of money, had excited a keen interest and a divided sentiment among the people of the quiet village of New Gloucester and vicinity. As is true in the development of all such controversies, all these people arrayed themselves in support of one side or the other of the contention. Every-

thing that Mr. Chandler said or did in the presence of any of these witnesses was recalled and undoubtedly discussed and so applied to his mental and physical condition as to support the particular bias of the witness presenting it. While witnesses are thus arrayed against each other, their convictions strengthening with the growth and heat of the discussion, although they may be honest in their purpose, they cannot, while human nature remains unchanged, overcome the tendency to distort, magnify or minimize the incidents which they relate as their interest persuades. That Mr. Chandler's mind was in a precarious condition on August ninth, nobody disputes. That he was forgetful and at times dazed, and at all times for several months prior thereto, partially incapacitated, nobody denies. But there was a line some where between the beginning and the end of the malady which finally carried him off, where he passed from the possession of a sound to that of an unsound mind, as this term is defined in law. The question is whether, in the progress of that disease, he had passed that line on the ninth day of August. None of these neighbors and friends pretend to have any personal knowledge of his mental condition on that particular day. Does their testimony, when massed upon the single point of testamentary capacity, as to his mental condition before and after, establish the conclusion that upon that day, he was incapable of making a will? The effect of this testimony as a whole is that, physically, Mr. Chandler for nearly a year after this date was able to be about; to attend his meals with the family at the table; to go into Portland from time to time with Andrew who attended him; to walk about the village alone and go to the post office ; to attend church and Sunday school; that he lived and was about, gradually declining, for more than a year, and that he died December 31, 1903, more than sixteen months later. This class of testimony as to his mental condition, covering the year 1902 and 1903, has a tendency to show that prior and up to August ninth, his mind was somewhat impaired ; that he was growing forgetful ; that their were times when his ideas were confused and his mind dazed ; that when he was tired these spells came upon him, and when he became rested, they passed away ; that these confused spells were manifested by various acts

and statements; that at other times his conversation was coherent and intelligible; his acts rational; his appearance normal; that the normal was his general condition up to August ninth, and the confused and dazed, the exception. That, during all this period up to and beyond August ninth, he did not have lucid intervals for a longer or shorter period, does not appear from a single witness. That he did have such an interval on August ninth, without a single incident occurring upon that date to contradict it, affirmatively appears from the testimony which we have already reviewed. We are therefore still unable to say that the proof of his condition as discovered by the testimony of his neighbors and friends, prior and subsequent to August ninth, necessarily shows such a mental condition on that date as to outweigh the evidence already considered in proof of his legal sanity.

The next class of evidence to which our attention is called is that of the medical experts. The testimony of the seven witnesses who testified under this head contains more than six hundred pages of the report. Four eminent alienists testify, upon the one side, upon long hypothetical questions purporting to contain facts and incidents, in the life of Mr. Chandler pertinent to the issue, that, on the ninth day of August, he was of unsound mind. Three, equally eminent, are called upon the other side, who, upon hypothetical questions purporting to contain similar facts and incidents, as unhesitatingly testify that on the same day, he was of sound and disposing mind. The facts and incidents contained in the hypothetical questions put by the proponents are objected to on the part of the contestants, on the ground of the omission of facts which should be considered and of containing statements which should be omitted. To the hypothetical questions put by the contestants, the proponents interpose a similar objection. To distinguish the admissible from the inadmissible, for the purpose of determining whether the objections upon either side are well founded, would be practically impossible. We shall therefore not attempt to review the hypothetical questions, nor to excuse the opinion expressed by any of the eminent alienists as being based upon any. alleged over-statement or under-statement of facts therein contained. We do not entertain the slightest suspicion, if the hypothetical ques-

tions put by the contestants had been so changed as to be absolutely satisfactory to . the proponents, and the same had been done with respect to the questions put by the proponents, that any one of the eminent specialists would have changed his testimony, or the reasons therefor, in the slightest degree. Their testimony upon the one side and the other clearly demonstrates that they were inclined to testify in favor of the side which called them. In considering their testimony we have endeavored to apply the test of consistency and reasonableness, always having reference to the other testimony in the case which their opinions may tend to corroborate or contradict.

Judged by this criterion we find an inherent weakness in the very foundation upon which their conclusions rest. First, we discover that the experts called by the contestants have made no proper distinction in giving their opinion nor could they do so under the law, between medical and legal sanity. We may say here, that this criticism does not apply to the three experts who testified that the testator, in their opinion, was of sound mind on August ninth, because a medically sound mind must necessarily include a legally sound mind. On the other hand the opinion of the four witnesses, whose testimony does not differentiate between a medically sound mind and a legally sound mind, is entitled to weight, only when the other evidence shows that it applies to legal unsoundness ; because a mind legally sound may be medically unsound. It may require additional and different evidence to prove legal unsoundness. That is to say, medical unsoundness may intervene in the diagnosis of a case before legal unsoundness appears at all ; therefore these medical experts may be correct in their opinions as to medical unsoundness without having expressed any opinion at all as to legal unsoundness. Unless then, it is shown from some source, that these opinions apply to legal unsoundness they are of but little value. And three of them expressly declare that their opinions relate only to medical unsoundness.

Again the error underlying the basis of Dr. Bancroft's opinion, the only expert called by the contestants, who says he founded his opinion upon the evidence instead of the assumptions, is illustrated by quoting a few questions and answers of his cross examination.

Q. You have undertaken to give your opinion based upon all the evidence in the case, have you? A. Yes sir. Q. Where there is a conflict of evidence, how have you reconciled it, to whom have you given the benefit of a doubt? A. I have carefully weighed the evidence and have placed it where I thought it belonged. Q. You have undertaken to pass on all the evidence, have you not and given an opinion? A. I have. Q. You have assumed the province, have you, of the court and jury in giving your opinion upon all the evidence in the case? No sir. Q. You have undertaken to give your opinion, haven't you, upon all the evidence in this case? A. I have not undertaken to assume the province of any court or any jury. Q. Have you undertaken to give your opinion and to find the fact that he was of unsound mind on this evidence? A. I have undertaken to *weigh all* the evidence from a *medical point of view* and pronounce an opinion. Q. And you have undertaken a sort of judicial medical position in doing it, have you, or undertaken to? A. I have undertaken to answer in a *medical opinion*.

For two reasons the opinion of this witness is entitled to very little weight. One is, that he gave his own interpretation to more than two thousand pages of testimony, then based his opinion upon his own interpretation. Now, we have already said as clearly appears from the record that a large part of the testimony was inadmissible. This medical expert says that he " carefully weighed the evidence." What evidence? Is it to be presumed for a moment that he eliminated the inadmissible from the admissible? There is no pretence that he did or could. Suppose he based his opinion upon the testimony of Charles P. Haskell; what part of it did he adopt; the hearsay, the opinion, or the facts? We are unable to say, and therefore it would appear that no further comment is necessary to show the unsatisfactory character of an opinion thus given. The second is, he gave only a medical opinion. He does not pretend to have differentiated between medical and legal unsoundness. Whether this opinion covers legal unsoundness can be ascertained only by reference to the other testimony.

All the experts concede that Mr. Chandler died Dec. 31, 1903, from senile dementia; that he had become a senile dement sometime

prior to this date, all agree, and whether this disease had fixed itself upon him on the ninth day of August to such a degree as to incapacitate him mentally, is where the doctors disagree.

Again upon this point the experts for the contestants have gone so far in their effort to make the testator a senile dement on that day, as to render their testimony of substantially no value. Let us subject a vital part of it to the test and see if, in the light of their own statements, it meets the standard of consistency and reason. Dr. Channing on page 358 admits that he testified as an expert in the case of *McCoy* v. *Jordan* at Dedham in 1902, and described normal old age as distinguished from senile dementia, as follows : Q. I will read the question to you. " Assuming that the arteries as you felt them at the wrist, or at the temples, or in the neck, or wherever you can feel them, especially in the arteries at the wrist, show a degree of hardness that comes from what we call an atheromatous deposit, a sclerosis, a' hardening of the arteries caused by a deposit, an atheromatous deposit, and that in a measure cuts off the supply of the blood to the brain, the brain shrinks and loses its power in proportion as that condition of the arteries in the body and generally in the brain exist, that the brain does not get the nutriment necessary for its growth and development to keep it in good order, and it becomes shrunken and weakened, and that weakening is shown by loss of memory, by enfeebleness of the memory, by hesitation in speech, by a disposition to dwell upon things in the past and forget things in the future ; I will ask you whether or not those things are characteristic of senile dementia as distinguished from normal old age." I will read the answer : " I should say not. That is the rule in old age. You do get those things sooner or later in the arteries." Whether or not you recognize that question and that answer? A. I do vaguely, yes.

This was a case in which the question of senile dementia was involved and this same expert says in answer to the question, Q. I ask you whether or not you stated yesterday that on August ninth the disease of senile dementia was well advanced in the hypothetical man ? A. Yes, I think it was. Q. Did you hear the testimony of Dr. Cowles? A. I did. Q. Did you hear him state that

there was a grave condition of dementia in 1902, and on August ninth a *strong and pronounced type*? A. As I remember it, I did. The hypothetical man was the testator. On page 361 of the report is found a definition by this same expert upon the same trial, of a senile dement, the important part of which is as follows: "Senile dementia is a diseased condition as contradistinguished from a condition that is to be regarded as a normal one. It is a form of insanity; form of mental disease. The individual who has this form of disease has little or no memory. If there is any memory at all remaining, it is for nothing of importance; simply an automatic mental operation. He has no memory for persons or places or names, or, as a rule, even for his own name. He practically remembers nothing of a recent period, and, as a rule, nothing of a remote period. In case of normal old age he generally has a relative one, but in senile dementia there is an absolute change. In normal old age a man, to a greater or less degree, can put his mind upon matters that seem important to him. He is able to give his attention more or less continuously to matters of interest; but a man with senile dementia is not capable of doing that; it is a man practically without a mind, without the use of his mental faculties; reduced to more or less of an automaton, and living the simplest kind of a life on a more or less animal scale; and he not only shows these marked mental changes but also a good deal of physical disturbance."

It will be here noted that these experts declare that on the ninth day of August, the testator presented a *strong* and *pronounced* type of senile dementia. That is, on that day, Mr. Chandler was a man, according to the definition just given, practically without a mind; without the use of his mental faculties; reduced to more or less of an automaton; and living on a more or less animal scale. Now the evidence from all the witnesses upon both sides, who knew and saw Mr. Chandler up to August ninth, flatly and effectually contradict the above conclusion of the medical experts as to his actual condition on that day. We need only refer to the testimony already alluded to, to establish this assertion. The hypothetical man who, these experts say, was an automaton and reduced to a condition little better than an animal, was not the Mr. Chandler who was present on the

ninth day of August at the making of his codicil; who designated the amount which should be given to his legatees; who inquired after the health of Madam Chandler and who exhibited no incident of mental unsoundness to any of the witnesses who observed him upon that occasion. It seems to us that a fair interpretation of the evidence, as a whole, rather places Mr. Chandler, on the ninth day of August, in the classification of men who have reached a normal old age, as defined by the witness, or was crossing over that unknown border that marks the fatal passage from normal old age to senile dementia. This single contradiction of the expert opinions illustrates not only how dangerous, but how unfortunate, that men of great knowledge, experience and skill, should array themselves upon different sides of the same proposition, which can have but one solution in truth, and come to absolutely contrary conclusions. It is evident that such testimony is not only worthless but insidious and dangerous, for it is impossible for a layman, in the analysis of such testimony, to distinguish the true from the untrue. If the untrue is acted upon injustice must follow.

Another fundamental weakness in the testimony of the experts for the contestants is that their testimony does not apply to the condition of the actual Mr. Chandler but to a hypothetical man who, we conceive, is supposed to represent Mr. Chandler in the hypothetical questions. Dr. Channing is asked if, assuming that the hypothetical question or questions did not include all the substantial facts proved at the trial, his answer would be more or less modified on that account. He says in answer, "I should say that a sufficiently strong case was made out in the hypothetical questions which would not be materially changed." Then further along he is asked, "suppose the evidence shows a different state of facts, whether or not your opinion would be partial?" A. That would be a different condition of affairs and of course I would have to weigh whatever there was. That would be an entirely new proposition and I should have to take it up anew. I have given a definite opinion on the *hypothetical* question,— the facts in that question. Then further along he is again asked, "So you are not speaking of the mental condition of the man whose mind is being investigated, are you, in this hypothetical question?" A. I

am speaking of *a* man in *a* hypothetical question when I am speaking of that subject. Then again when asked whether or not in the hypothetical question, he was speaking of the man whose mind was being investigated in this proceeding, he answered no.

Dr. Jelly says that although he read the evidence and depositions and heard the testimony for several days, yet, as his opinion depended upon the truth of the hypothetical questions, he could have given his opinion " just exactly as well by reading the hypothetical question as by hearing the evidence." That is to say, if the hypothetical questions assumed statements of facts not existing, or omitted those that did exist, in the language of one of the eminent specialists, that would present " an entirely new proposition and I should have to take it up anew." In fact he admits that if the hypothetical questions were wrong his opinion was wrong. That the questions were wrong can be demonstrated from the following testimony. Dr. Cowles was asked this question: " Assuming that Howard Gould, who had known Mr. Chandler for many years, met him in the latter part of the summer 1902, probably in August, at the Falmouth Hotel in Portland, and had a conversation with him, Mr. Chandler inquiring about Mr. Gould's wife, whom he knew and had known for years, calling her by name, and inquired for her sister, calling her by name, inquiring for Mr. Gould's son; and that there was nothing peculiar about him at that time, no incoherence in his talk nor change in his intelligence from former years; did you consider that assumption of fact in your hypothetical question?" A. There was no assumption of that nature that I remember in the question. Q. That was eliminated entirely from the hypothetical question, was it not? A. I didn't hear it in the question. Yet Howard Gould did testify as to the conversation with Mr. Chandler in the Falmouth Hotel, as follows: "I met him, I think, in the corridor of the hotel, and he inquired for my wife, and called her by her name, Sarah, and wanted to know how Sarah was, and if she was well and if she was enjoying good health. He said he hadn't seen her for a long time, and he inquired for her sister, Martha Stowell, and wanted to know how she was, and where she was living at the present time, if she was with me; and then he inquired for my son

Arthur." He further said that he did not observe anything peculiar about him at that time nor any incoherence in his talk nor notice any change in his intelligence different from former years. Dr. Cowles admits that if this testimony was true it showed both memory and intelligence ; still he did not consider it.

These questions and answers present but one of the numerous instances of a similar nature to be found in the evidence calculated to show the one sided character of the medical testimony. In other words, these experts are testifying to the mental condition of an assumed man, whom they, themselves, had helped to create, by aiding in formulating the hypothetical questions, with the avowed purpose of declaring him a dement. That the hypothetical questions upon both sides are erroneous in the rehearsal of facts is manifest from a casual reading. The statements upon the different sides differ materially, and it follows as a corollary that one, the other, or both must be wrong. The truth is, all are wrong. They are made up from a prejudiced view and for a predetermined purpose. The ordinary rule of law with reference to the effect of interest upon credibility should be here applied with special force. Such opinion evidence presents an unsafe criterion upon which to found a judgment affecting important interests. It might make an appalling difference in deciding this important question, whether the assumed material found in this hypothetical man corresponded with real material of which the actual man was constructed. And whenever the expert, who has never examined the actual man as many of the witnesses have, fails to satisfy us that the assumed and the real correspond, we must decline to accept his opinion upon the point in issue, as of sufficient value to overthrow the testimony of witnesses, having personal knowledge of the real man. We shall not discuss the testimony of the proponents' experts further than to say that to our minds they have given fully as satisfactory reasons for the opinions they have expressed in the case as have the experts on the other side. Upon the whole, we consider it more consistent with the facts shown by the other testimony and therefore entitled to some probative force. In fine, we at least think the opinion evidence of the proponents fully

as convincing of the truth of their position, as that of the contestants is of theirs.

We have not undertaken to discuss this class of testimony in detail. We have, however, endeavored to explore the grounds upon which the experts based their conclusions, and to discover, if possible, the foundation upon which their opinions stand. This accomplished, our conclusion still is that the testator's legal sanity, on August ninth, as before declared, has not in the least been shaken by the testimony of the medical experts.

The next class of evidence bearing upon the issue of mental capacity is found in the production of the memoranda and diaries. These furnish us but little aid as Mr. Chandler practically ceased writing before 1902. The last of his handwriting showed an unsteady hand and an imperfect sight. Letters were repeated and the lines were crooked. We should hesitate, however, to say that this defect in the chirography of the testator was evidence of any greater decay than that which may be attributed, in many instances, to the weakness incident to approaching old age. It needs no expert to inform us that the hand may tremble and the sight may fail, long before the mind is deprived of its mental grasp. These evidences of mental incapacity therefore must be considered in each particular case in connection with the other testimony. The other testimony may show that these defects are due solely to mental decline. It may show that they are due to other causes. Without attempting to assign any particular cause, it is sufficient to say here that the production of the memoranda and diaries, considered in connection with the testimony tending to prove the testator's legal sanity, on August ninth, which we have already reviewed, does not overcome the effect of that testimony.

Our conclusion upon this phase of the case is, after a careful examination of the evidence, to only a small portion of which we have been able to allude, that Solomon H. Chandler on the ninth day of August 1902, was in the possession and exercise of sufficient mental power to render him of sound mind in the sense that the law requires it.

But the contestants go further and assert that even if the court

arrives at the conclusion that Mr. Chandler was in the possession of testamentary capacity, on the ninth day of August, the codicil should still be overthrown, because of the exercise of undue influence in inducing the testator to make it.   They also claim that they have proven the existence · of such fiduciary relations existing between Mr. Neal, Mr. True and Mr. Chandler, as to impose upon the proponents the burden of showing the absence of undue influence.   But such is not the rule in this State.   *O'Brien, Appellant,* 100 Maine, 156.

It is charged in the argument of counsel that " the preparation and execution of the codicil was the combined act of the tripartite guardianship of John W. True, William K. Neal and Andrew C. Chandler. This tripartite guardianship contributed a large beneficiary, an executor, a self-assumed attorney for the estate and custodian of the codicil and provided the witnesses in part from its composite self and the remainder from servants within the sphere of its influence, without any action or request from Mr. Chandler."

We are unable to find anything in the evidence that establishes the truth of the above charge, or warrants the severe expression of counsel.   It will require more than the acrimonious epithets of those subject to unexpected disappointment, to induce us to believe that men, who have passed middle age without a suspicion of wrong, for no greater consideration than appears in this case, have suddenly overthrown the reputation of a lifetime, and at once become unprincipled and sordid malefactors.   It is our duty to decide the case upon the evidence and not upon inuendo or rhetoric.   What then is the basis of the serious charge made by the contestants against these three men ?   What took place at Mr. Neal's office when and where the first suggestion, as to any change in his will, was made to Mr. Chandler ?   We will quote substantially all the testimony upon this point.

With respect to the interview at the office and how Mr. Chandler happened to be there, Mr. Neal said in answer to whether he sent for him " I never sent for him to come and see me at any time, for any purpose."   It is therefore plain that Mr. Neal cannot be charged with securing the presence of Mr. Chandler in his office. He further says, he spoke to him about the matter of the will and

in reply to the question, " What did you say to him," answered, " I said that I had been informed that he had made one or more wills, and that in them he had given all of his property to foreign missions, and nothing to his relatives, and asked him the question if that was not a little strange; to which he replied, as I now recall, that that was a notion which he had; and I asked him then in regard to his nephews, as to what sort of men they were, and he gave them a very high recommendation."

Now as to what was said by Mr. Neal, or by anybody else in the office, to Mr. Chandler with respect to making a change in his will appears in the following statement, in answer to a question ; " I will say, that as he got up to leave the office I said to him,—if you think this matter over, Mr. Chandler, and decide to make any change, drop in and see me when you are down here, or words to that effect. I cannot give the exact words, and he said,—I will see, and went out." That is all that Mr. Neal ever said or did, as shown by the evidence, by way of attempting to influence Mr. Chandler at the interview in the office. There is not a syllable of testimony in the case which pretends to show that anything else was ever said or done. That the inquiry of Mr. Neal can be distorted into an exercise of undue influence, is too trivial to discuss. Nor does the testimony show that any other influence of any kind was at this time exerted upon Mr. Chandler. We find no legal or moral impropriety, under the circumstances of Mr. Chandler's visit to Mr. Neal's office, in Mr. Neal's inquiry.

He had a right under the law to suggest to the testator to provide for his relatives who were the natural objects of his affection and bounty, but he did not even go to this extent. He only asked if it was not "a little strange " that he had omitted them in the distribution of his property. Mr. Neal was not a relative of the family ; he took nothing under the codicil, nor was he in any way directly interested in this instrument, nor did he have any personal interest in the distribution of the property. The case also shows that he had no knowledge and took no part in placing Mr. Chandler under guardianship, and that, on August ninth, he went to New Gloucester for the direct and express purpose of assisting in the draft of two wills

for neighbors of Mr. True.   His interview with Mr. Chandler and the making of his codicil upon this day were, consequently, incidental to the main purpose.

From the time Mr. Chandler left Mr. Neal's office until the ninth day of August, there is neither claim nor pretence that any of the three men charged, or any other person, even made mention of the word will or codicil to Mr. Chandler.   If a conspiracy had been working in the hearts of these men to improperly influence Mr. Chandler in the distribution of his property, something would have occurred in the furtherance of that purpose in the interval between the visit at the office and August ninth.   Up to this date we fail to find a single word or act, on the part of either one of the three men charged with the conspiracy, calculated to influence Mr. Chandler in the least degree.

What then do we find upon August ninth?   We have substantially quoted all the testimony of Mr. Neal brought out upon cross examination relating to what was said and done upon that occasion. We need not repeat it.   It is sufficient to say that not one word can be attributed to the lips of either one of these three men in any way urging, or in the least degree persuading, Mr. Chandler to make and execute the codicil in question.   A most careful scrutiny of the evidence will show that Mr. Chandler instead of being requested to do anything, was asked if he had thought over the matter of making a change in his will, and then, what he had concluded to do; and that Mr. Chandler made the reply that it was rather natural that he should give his relatives something and thought it would be right.   Then Mr. Neal inquired how much he desired to give and suggested that he could give a specific sum or make it a percentage, and Mr. Chandler suggested ten per cent.   Mr. Neal retired, made the codicil, brought it back, read it to Mr. Chandler, then placed it upon the roll top desk, told him that he could look it over and at some future time, when he came into Portland, sign it.   Upon which Mr. Chandler at once replied, it is all right, why not sign it now.

The evidence of this day's transactions instead of tending to prove a conspiracy, conclusively proves the contrary.   If these three men had entered into a plot to influence and induce Mr. Chandler to

execute a codicil, diverting the succession of one-half of his property, the instrument by which this unlawful act was to have been accomplished, would not have been laid upon the roll top desk to be looked over, and at some future time signed by the victim of the conspirators. In fine the evidence surrounding the execution and making of this codicil presents no features of an unusual character. There is no evidence in the case that Andrew Chandler said one word with respect to the disposal of the property and that Mr. True simply inquired of him if he desired to remember Madam Chandler. While Mr. True was guardian of Mr. Chandler, he was the recipient of no favors under this codicil. And he reiterates his statement of denial, in every possible form, that any one of the nephews, the Chandler boys, or the widow of the deceased brother, Mr. Neal, or any other person ever requested him in any way directly or indirectly, to talk or confer with Mr. Chandler as to the disposition of his property.

The burden of proof rests upon the contestants to sustain the allegation of undue influence by a preponderance of the evidence. They have failed to do so.

The next proposition which the contestants assert as a reason why this codicil should not be sustained is that the three men above charged with the exercise of undue influence were also guilty of a fraud upon Mr. Chandler in inducing him to execute the codicil. We feel called upon to notice but one allegation under this head and that is that Mr. Neal read to Mr. Chandler the will and codicil of 1896, instead of the latter will of 1897, as the will which the new codicil of 1902 was intended to republish.

We have already quoted in full item three of the will of 1896 and shown that the corresponding item of the will of 1897 was identical, with the exception of the clerical omission of two unimportant words. That is, the two wills were in their substantial features precisely alike. Mr. Neal read the will of 1896 and the codicil, and at the request of Mr. Chandler, read it again, and as we have already held, under the question of testamentary capacity, he comprehended and understood it. With the exception of the provision in the will of 1897 directing a speedy settlement of the estate and a change or

addition in the Board of Executors, there was no difference in the provisions of the two wills. It is apparent, therefore, that the codicil affecting the will of 1896 instead of that of 1897 perpetrated no fraud either upon Mr. Chandler or the residuary legatees under the will of 1897. The situation of the residuary legatees was not changed in any degree because the codicil was applied to the will of 1896 instead of that of 1897. If the testator was possessed of such mental capacity on August ninth as enabled him to comprehend the effect of the codicil which he executed, and we have decided that he was, we find in the evidence presented upon the question of fraud, no adequate reason for setting it aside.

Our final determination upon all the contentions of fact is, that the codicil republished the will of 1896, and the codicils thereto, which became a part thereof, and that said will and codicils are valid instruments representing the last will and testament of the testator, Solomon H. Chandler.

> *Appeal dismissed. Decree of Probate Court that the instrument purporting to be the last will and testament dated March 10, A. D. 1896, of Solomon H. Chandler, late of New Gloucester in the County of Cumberland, deceased, and codicils thereto, dated August 11, 1896 and August 9, 1902, be approved and allowed and that letters testamentary issue to the executors, affirmed; ordered, that the costs, stenographers and counsel fees, and other expenses of the proponents and executors, in the Probate Court and Supreme Court of Probate, be paid out of said estate by the executors, and charged in their account with said estate. Case remanded to the court below for further proceedings in accordance with this opinion; it is further ordered that the estate is not to be charged with the payment of any costs, stenographers or counsel fees, or other expenses of the contestant.*