# CASES DECIDED

IN THE

# Supreme Court of Appeals

## OF VIRGINIA.

---

### Richmond.

#### RUST AND OTHERS v. REID AND OTHERS.

#### November 14, 1918.

1. JURY—*Disqualification of Juror—Bias or Opinion.*—The trend of recent decisions is in the direction of limiting, rather than extending, the disqualification of jurors by reason of mere opinion. Whatever the mind receives has an effect upon it, passing with almost infinite graduation from a mere impression to a fixed belief. The State strains every nerve to disseminate knowledge. By the diffusion of education it hopes to create a higher citizenship and to find the means of repressing vice and crime; but if the courts take an extreme position on this subject, and hold that every opinion shall work a disqualification for service as a juror, the administration of justice will be confided, not to the most intelligent, but to the most ignorant of our citizens. The courts, therefore, while resolute in seeing that every man shall be tried by an impartial jury, inquire into the quality and degree of the opinion, and to that end search the conscience of the juror upon his *voir dire*, and look into the sources of the information upon which his opinion rests.

2. JURY—*Disqualification of Juror—Opinions Formed by Jurors— Appeal and Error.*—Upon the question of whether a venireman has formed such an opinion as disqualifies him from serving as a juror, great weight is justly due to the opinion of the trial judge, who sees and hears the venireman.

3. JURY—*Disqualification of Juror—Bias or Opinion.*—If the examination of a juror upon his *voir dire* impresses one with the

1

fairness of the juror, his lack of bias or prejudice, his desire to do justice to both parties, regardless of former impressions or expressions, and of his good faith in that regard, he is a competent juror.

4. JURY—*Disqualification of Juror—Bias or Opinion.*—Where the reading of the testimony of each juror and the cumulative effect of the testimony of all of them upon their *voir dire* examinations does not create a lasting impression that all the jurors stood "indifferent in the cause,". a suspicion at least of unfairness or partiality is cast on the composition of the jury which tried the issue, and it is essential that the jury should be free from suspicion of unfairness or partiality.

5. JURY.—*Qualification—Bias—Personal Knowledge of Jurors.*— Where the question at issue is the testamentary capacity of the deceased, it is not easy to see how jurors who had been intimately acquainted with the deceased for years, and some of whom had had dealings with him, could disabuse their minds of opinions as to the mental capacity of the deceased, and render a verdict solely on the evidence adduced on the trial. However honest they may have been in their belief that they could do so, the law does not put them to such a test, nor subject the administration of justice to the suspicion of partiality.

6. JURY—*Qualification—Bias—Personal Knowledge of Jurors.*— A juror is not incompetent to serve simply because he is acquainted with one of the parties, or knows some fact or facts material to the issue. There are many facts material to the issue that are not controverted, such for instance as the *corpus delicti* in a criminal prosecution, the venue of the action, the reputation of a witness for truth and veracity, and the like, but where he has knowledge of *controverted facts*, material to the issue, which would tend to bias his opinion as a juror, and it appears from his examination on his *voir dire* that he has made up and expressed an opinion upon that question which it would require evidence to remove, he cannot be said to "stand indifferent in the cause."

7. JURY.—*Qualification—Bias—Personal Knowledge of Jurors.*— A party may be able to remove impressions or opinions which are known to rest upon newspaper reports, or other hearsay evidence. Indeed, opinions based upon such foundation are rarely fixed and decided. But when based on personal knowledge of the juror of controverted facts, it is usually of such a fixed and abiding character as to place the juror in the class of those whom the statute declares do "not stand indifferent in the cause."

8. Jury—*Coming from Another City or County—Criminal Cases —Change of Venue.*—No provision is made by statute for getting qualified jurors in a civil case from another city or county, and the power to obtain such jurors is not inherent in the court. Section 4024 of the Code of 1904 provides for such jurors in a criminal case, but not in a civil case. In the instant case if an impartial jury could not have been obtained in the city where the case was tried, appellants should have moved for a change of venue and not for a jury from another city or county.

9. Jury.—*Special Jury—Appeal and Error.*—An application for a special jury is one addressed to the sound discretion of the trial court, and the action of the trial court on such a motion will not be reversed unless it is made to appear that its discretion has been improperly exercised.

10. Presumptions and Burden of Proof—*Sanity—Insanity.*— Sanity is the normal condition of the human mind, and every man is presumed to be sane until the contrary is made to appear. After adjudication of insanity, a presumption of insanity continues, but a subsequent adjudication of restoration to sanity by competent authority restores the previous presumption of sanity until the contrary is made to appear.

11. Testamentary Capacity.—*Burden of Proof.*—The burden of proving testamentary capacity is on the propounder of the will and continues upon him throughout any contest on that question, but when he has shown a compliance with all the statutory requirements for the due execution of a will, the legal presumption of sanity comes to his relief and dispenses with any evidence to the contrary. The proof of due execution therefore entitles the propounder *prima facie* to have the will admitted to probate.

12. Order of Proof.—*Discretion of Court—Appeal and Error.*— The order of introduction of evidence lies largely in the discretion of the trial court, and its ruling will not be reviewed where no prejudice or injury to the party objecting is shown.

13. Order of Proof.—*Testamentary Capacity.*—In the instant case where the question at issue was the testamentary capacity of deceased, who had been confined in hospitals for the insane for many years, but had been discharged as restored to sanity and continued to exercise and enjoy his rights and privileges as a sane man until his death, there was no error in permitting the propounders of deceased's will to rest their case upon proof of the due execution of the will. They had the option to introduce their evidence as to the testator's sanity in chief, or in rebuttal.

14. Assignments of Error.—*Instructions—Pointing Out Error Complained of.*—An assignment of error that the verdict of the jury should be set aside because the court erred in giving instructions 1 and 12, inclusive, for the proponents, for reasons apparent on the face of those instructions and because the instructions were not applicable to the evidence in the case, will not be considered because it does not point out the error complained of.

15. Assignments of Error.—*Instructions—Pointing Out Error Complained of.*—Where the grounds of objections to instructions are not set forth with sufficient certainty, they will not be considered by the appellate court.

16. Testamentary Capacity.—*Instructions.*—Where the question at issue was the testamentary capacity of the deceased, the trial court instructed the jury as follows: "While the burden of proof is upon those offering a will for probate to show testamentary capacity on the part of the testator at the time the will was executed to the satisfaction of the jury, yet the court tells the jury that there is in all cases an existing presumption in favor of the testator's sanity and capacity, which is to be taken into consideration by the jury in determining the question of competency." It is objected to this instruction that the latter part was in conflict with the first part.

Held: That the jury could not have been misled in applying the instruction to the facts of the case.

17. Testamentary Capacity.—*Instructions.*—Where the question at issue was the testamentary capacity of the deceased, the trial court instructed the jury as follows: "The court instructs the jury that the testimony of credible witnesses present at the execution of the will is entitled to peculiar weight on the question of testamentary capacity and that this is especially true of attesting witnesses whose duty it is to ascertain and judge of the testator's mental capacity at the time." It was objected to this instruction that it was erroneous in that it commented upon the weight of the testimony of the attesting witnesses to the will and told the jury that their evidence was entitled to peculiar weight upon the question of testamentary capacity.

Held: That the instruction followed well established precedents, and there was nothing in the evidence in the instant case which took it out of the operation of the general rule.

Appeal from a decree of the Corporation Court of city of Staunton. Decree for defendants. Complainants appeal.

*Reversed.*

The opinion states the case.

*Edwin E. Garrett, Fitzhugh Elder* and *M. J. Fulton,* for the appellants.

*Timberlake & Nelson, Charles Curry* and *Jos. A. Glasgow,* for the appellees.

BURKS, J., delivered the opinion of the court.

The bill in this case was filed under section 2544 of the Code by the next of kin of Frederick G. Rust, deceased, praying an issue *devisavit vel non* to determine whether a writing which has been admitted to probate as his will was the true last will and testament of the decedent. The will was contested on the ground (1) of the insanity of the testator at the time of its execution, (2) of undue influence exerted over him by the beneficiaries, and (3) of the insane delusion of the testator that his father and his father's family had placed him in insane hospitals and kept him there in order to get his estate. All of these grounds were contested by the beneficiaries under the will. If any one of them was sustained, the will would be set aside. Upon these issues the parties went to trial before a jury. At the first trial the jury were unable to agree upon a verdict and were discharged. At the second trial, the jury found in favor of the will, and a decree was entered accordingly. From that finding and decree this appeal was taken.

The point most urgently insisted upon in the oral argument was that the contestants did not have a fair trial be-

fore an impartial jury of the issues involved. The persons called as jurors were severally examined on oath, as provided by section 3154 of the Code, to ascertain if they stood "indifferent in the cause." The examination of these persons, so far as pertinent to the objections raised, is given below.

H. H. Fultz.

"Q. Have you formed or expressed any decided or fixed opinion in regard to the issue?

"A. Yes, sir, I have.

"Q. Is that opinion so decided and fixed that you on your oath do not think you could go upon the jury and give a fair and impartial verdict?

"A. I wouldn't like to say about that. I have expressed an opinion several times, but I wouldn't like to say I couldn't go on there and give a fair trial.

"Q. What is your opinion based on—what you have heard and read in the newspapers?

"A. Yes, sir.

"Q. Were you present during the last trial of this case?

"A. No, sir.

"Q. You didn't hear any of the evidence?

"A. No, sir.

"Q. Then you could not say you could not go upon the jury and give a fair and impartial trial?

"A. No, sir.

By Mr. Elder: "He has expressed an opinion and he has already formed an opinion. We think he ought not to be accepted. It will certainly take evidence to dislodge that opinion, whatever it is. We don't know what the opinion is. We don't think he, from his own statement, could make a fair juryman. I know Mr. Fultz and like him, and he may take our view of this matter, but even so, he would not be a proper juryman.

By the Court: "Q. As I understand you, Mr. Fultz, your state of mind now is that you could go upon the jury and listen to the evidence and base your verdict upon the evidence?

"A. Yes, sir, I believe I could, as far as that goes."

C. V. Shuey, being examined on his *voir dire*, testified as follows:

"Q. Have you formed or expressed any fixed or decided opinion in the matter?

"A. I have expressed an opinion, but don't know whether it is decided or not, just what I know of him.

"Q. You have expressed an opinion, but don't know that it is decided?

"A. No, sir, I don't know that it is decided.

"Q. Do you feel, Mr. Shuey, that you could disregard that opinion entirely and go upon the jury, listen to the evidence and give a fair and impartial trial, based entirely upon the evidence?

"A Yes, sir, I think I could.

By Mr. Fulton: "Q. Do you feel biased in favor of either one or the other in the case from what you know about the facts and circumstances? Have you got any personal opinion now?

"A. I expect I have rather formed an opinion on one side.

"Q. I do not ask you which side it is, but you do feel biased on one side?

"A. Yes, I believe I am.

"Q. Did you know Mr. Rust himself?

"A. Yes.

"Q. And from the facts and information as you know them now you feel biased one way or the other?

"A. Very much so, yes.

By Mr. Fulton: "Now the statute, your Honor, reads that if he has expressed or formed any opinion or is con-

scious of any bias or prejudice—Now he says he is conscious of a bias.

By the Court: "Q. As I understand you, Mr. Shuey, you feel that you could go upon the jury and base your verdict, not upon what you have heard in the past and not upon any opinion you have, but simply upon the evidence as you hear it from the witness stand?

"A. I think I could.

"Exception by contestants."

R. W. Johnson:

"Q. Have you formed or expressed any opinion in the matter?

"A. I have.

"Q. Is that opinion of such a nature and so fixed in your mind that you could not lay it aside and go upon the jury and listen to the evidence and give a verdict based entirely upon the evidence?

"A. Well, I haven't read of it and don't know that I could tell.

"Q. I simply want to know whether you feel you could lay aside your opinion as formed?

"A. Yes, I could lay it aside.

"Q. And base your verdict entirely upon the evidence as produced?

"A. Yes.

By Mr. Fulton: "Q. You say, Mr. Johnson, that you knew Mr. Rust?

"A. I knew Mr. Rust, yes.

"Q. You heard this matter discussed?

"A. I have heard it discussed outside.

"Q. I mean outside. This particular case to be tried you have heard discussed and from the information you have you feel you are sensitive of a bias in favor of one

side or the other—you needn't tell me which side, but you feel you have an opinion one way or the other about this matter?

"A. Well, I hardly know. I haven't taken enough interest in it to hardly say. That is, I have heard it discussed and discussed it off and on with people myself.

"Q. Have you ever expressed an opinion one way or the other about it?

"A. Well, yes, I have expressed an opinion.

"Q. Now I understood you to tell the court—I may have misunderstood you—that you said you did have rather a decided and fixed opinion. I may be in error, if I am I would be glad to be corrected.

"A. I don't know. All I can say is that I could hear the evidence all the way through and possibly change my mind.

"Q. It might possibly change your mind from what it is now?

"A. Yes.

"Q. You are then sensitive of a bias in favor of one side or the other at this time when you go in the box?

"A. In a way, yes.

"Q. And that is based upon the personal knowledge you have of Rust and also what you have heard?

"A. Yes.

"Q. About this case?

"A. Yes.

"Accepted.

"Exception by contestants."

A. Y. Pifferling.

"Q. The case to be tried is the contest over the will of the late Frederick G. Rust. Do you know anything about the matter?

"A. I attended part of the other trial.

2

"Q. You heard part of the other trial?

"A. Yes.

"Q. Have you formed or expressed any decided or fixed opinion in regard to the issue?

"A. I don't know, sir.

"Q. Do you think that you could go upon the jury and give a fair and impartial verdict based upon the evidence?

"A. Yes, sir.

By Mr. Elder: "Q. Mr. Piffling, you say you have not formed or expressed an opinion about this matter?

"A. I might have talked about it, but I don't think I have.

"Q. You have talked about it in the barber show, haven't you?

"A. Yes.

"Q. I saw you out walking Sunday evening with Mr. Kivlighan and Mr. Wehn. Did you talk about the case Sunday evening?.

"A. One of them said, 'I wonder who the new jury will be,' and I said I was one of them.

"Q. Did they say they had been jurymen before?

"A. They laughed and said something about it—didn't argue the case or nothing.

"A. Did they express an opinion about the matter?

"A. No, sir.

"Q. Did you express an opinion about the matter?

"A. No, sir.

"Q. You never expressed any opinion?

"A. Only Kivlighan said when meeting Mr. Elder on the street that he (Elder) will say 'We fixed you.' That is all that was said.

"Q. So you were talking about the matter?

"A. Yes.

"Q. Are you sensible of any bias in this matter either for the contestants or the contestees?

"A. No, sir.

"Exception by contestants."

Arthur H. Agner, being examined on his *voir dire*, testified as follows:

"Q. The case to be heard is the contest of the will of the late Frederick G. Rust. Do you know anything about the matter?

"A. No, sir, no more than I read and heard of it.

"Q. Have you formed or expressed any decided or fixed opinion about it?

"A. Yes, sir.

"Q. Is that opinion so fixed and decided, Mr. Agner, that you feel you cannot lay it aside and go upon the jury and listen to the evidence and base your verdict upon it?

"A. No, sir.

"Q. You mean you can or cannot do that?

"A. I can. It is not so fixed I could not.

"Q. It is not fixed so you could not?

"A. No, sir.

"Q. You feel you could go upon the jury, listen to the evidence and base your verdict entirely upon the evidence offered?

"A. Yes, sir.

By Mr. Fulton: "Q. You have an opinion now?

"A. Well, I haven't—I had at the time of the other trial, yes.

"Q. Have you still that opinion?

"A. Yes, still that opinion.

"Q. You are at this time sensible of a bias in favor of one side or against the other?

"A. Yes, sir.

By Mr. Timberlake: "Q. You mean to the extent of your opinion as already formed?

"A. Yes, sir.

"Q. But no bias against the parties on either side?

"A. No, sir.

By Mr. Fulton: "Q. It would require evidence to remove that opinion, woudn't it?

"A. Yes, sir. Of course, whether hearing the evidence would make any difference—the evidence might change me considerably. I only heard what was in the paper and discussed among the people.

"Q. Did you know Mr. Rust?

"A. Yes, sir.

"Q. Did you ever have any business dealings with him?

"A. Yes, small matters, not of great importance.

"Q. To what extent? How many times?

"A. Oh, well, a real business matter only once. That was in regard to renting some property from him.

"Q. Were you a tenant of his?

"A. Yes, sir.

"Q. So it would require evidence to remove your present opinion?

"A. Yes, sir.

"Exception by contestants."

A. P. Bickle.

"Q. Have you formed or expressed any decided or fixed opinion in regard to the matter?

"A. No, sir.

"Q. Do you know of any reason why you could not give a fair and impartial verdict?

"A. No, sir.

By Mr. Fulton: "Q. Are you sensible of any bias or prejudice, either one way or the other, Mr. Bickle?

"A. No, sir.

"Q. Did you know Fred Rust or have any business transactions with him?

"A. I am a merchant and I had transactions with him in the store, selling him goods?

"Q. How long ago?

"A. Some time ago. Once or twice a year he would drop in my store.

"Q. Have you any opinion about the matter at issue?

"A. No, sir, I haven't.

"Accepted.

"Exception by contestants."

S. A. Day.

"Q. Have you formed or expressed any opinion in regard to the issue?

"A. Well, Judge, I must say I have.

"Q. You need not tell me what your opinion is, but upon what is your opinion based, Mr. Day?

"A. Well, nothing more than just ordinary talk, nothing to base it on definitely. I haven't formed any opinion that could not be changed, but I have expressed it from just the little I heard, just current rumors.

"Q. Is that opinion such, Mr. Day, that you feel you could lay it aside and give a verdict based entirely and only on the evidence you heard?

"A. Why, certainly so.

By Mr. Elder: "Q. Did Mr. Rust come to your place right often in his life?

"A. A good deal, yes.

"Q. He used to play a game down there—what do you call it?—pinochle?

"A. I really don't know what the game was.

"Q. You knew him very well in a business way?

"A. Yes, sir.

"Q. And you have formed an opinion about this matter?

"A. Well, I am frank to say I have.

By Mr. Fulton: "Q. Are you now sensible of any bias or prejudice one way or the other? In other words, if you were asked now would you express an opinion on what you know?

"A. No, sir; understand me to say—

"Q. I am not asking you to tell which way you would express an opinion, but you have an opinion now one way or the other? In other words, have you a bias one way or the other?

"A. I have no bias one way or the other.

"Q. I don't mean a bias against anybody, but are you sensible of an opinion or conviction one way or the other at this time that would take evidence to change it?

"A. Yes, sir.

"Q. It would take evidence to change your opinion from what it is now.

"A. It certainly would.

"Q. How long have you entertained that opinion?

"A. Well, I would say ever since the matter was discussed about the contest of the will; just like anybody else would speak of those matters.

"Q. You talked with people about it?

"A. Yes, sir.

"Q. You expressed your opinion to those people?

"A. Yes, sir.

"Q. They expressed their opinions to you?

"A. Yes, sir.

"Q. And you have had an opinion, you say, ever since this matter first came up about the contest of the will. Could you state approximately about what time that was— a year, two years, or six months?

"A. No, it hasn't been that long.

"Q. Has it been six months?

"A. I could not state definitely, sir.

"Q. Approximately. I am just trying to find out.

"A. I am perfectly frank to state I could not say accurately.

"Q. But ever since this matter first began?

"A. It was discussed all around.

"Q. Is it a matter of general discussion here in Staunton?

"A. Yes, sir.

"Q. This contest has been a matter of very great discussion?

"A. Naturally so.

"Q. And you have discussed it frequently?

"A. Yes, sir.

"Q. And it has been discussed frequently in your presence?

"A. Yes, sir.

By the Court: "I understand you to say, however, that you could go upon the jury and discard any preconceived opinion that you have and base your verdict solely on the evidence?

"A. I certainly could."

After nine jurors had been obtained, counsel struck from the list the names of R. W. Johnson and Arthur H. Agner, leaving the remaining seven to compose the trial jury.

Section 3154 of the Code, under which these proceedings were taken is as follows: "The court shall, on motion of either party in any suit, examine on oath any person who is called as a juror therein to ascertain whether he is related to either party; or has any interest in the cause or has expressed or formed any opinion or is sensible of any bias or prejudice therein; and the party objecting to any

juror may introduce any competent evidence in support of the objection; and if it shall appear to the court that the juror does not stand indifferent in the cause, another shall be drawn or called and placed in his stead for the trial of that cause. And in every case the plaintiff and defendant may each challenge one juror peremptorily, where the jury consists of seven."

The question for consideration is, did any one or more of this panel "not stand indifferent in the cause?"

The testator was sixty-five years of age at the time of making his will and at the time of his death. He had been placed in a hospital for the insane at the age of eighteen years and had been kept in such hospitals for about thirty years almost continuously. He had been discharged, however, as restored in 1899, and from that time until his death in 1917, had resided in or near the city of Staunton. He was a familiar figure on the streets of that city. He was very eccentric. He was unkempt in appearance, and generally carried a sack or bag over his shoulder which contained such articles as he chose to place therein. By his will, he gave his entire estate, estimated as worth from thirty-five to fifty thousand dollars, to strangers to his blood. There had been a trial of the case, resulting in a hung jury, about three months before the case was called for the second trial. It was under these circumstances that the jurors aforesaid were called to sit on the second trial.

[1] It would be unprofitable to review all of the decisions of this court on the subject of the competency of jurors, and if we did we should be forced to the conclusion expressed by Judge Keith in *McCue's Case,* 103 Va. 870, 993, 49 S. E. 623, 626, that "the cases are not reconcilable." Among the most important cases on the subject, there may be cited *Wormley's Case,* 10 Gratt. (51 Va.), 658; *Jackson's Case,*

23 Gratt. (64 Va.), 919; *Little's Case,* 25 Gratt. (66 Va.). 921; *Wright's Case,* 32 Gratt. (73 Va.), 941; *McCue's Case,* 103 Va. 870, 49 S. E. 623; *Southern Ry.* Co. v. *Oliver,* 102 Va. 710, 47 S. E. 862; and *Mumford Banking Co.* v. *Farmers' Bank,* 116 Va. 449. We fully concur with Judge Keith in the following statement in *McCue's Case,* 103 Va. at pp. 988-9, 49 S. E. at p. 625.

"The cases upon this subject are almost without number, and they are not to be reconciled. The trend of recent decisions is in the direction of limiting, rather than extending, the disqualification of jurors by reason of mere opinion. Whatever the mind receives has an effect upon it, passing with almost infinite gradation from a mere impression to a fixed belief. The State strains every nerve to disseminate knowledge. By the diffusion of education it hopes to create a higher citizenship and to find the means of repressing vice and crime; but if the courts take an extreme position on this subject, and hold that every opinion shall work a disqualification for service as a juror, the administration of justice will be confided, not to the most intelligent, but to the most ignorant of our citizens. The courts, therefore, while resolute in seeing that every man shall be tried by an impartial jury, inquire into the quality and degree of opinion, and to that end search the conscience of the juror upon his *voir dire,* and look into the sources of the information upon which his opinion rests."

[2] We also concur in his statement, "that great weight is justly due to the opinion of the trial judge, who sees and hears the venireman." The subject of the weight to be attached to "a *decided or substantial* opinion" of a venireman is well discussed by Judge Moncure in *Jackson's Case,* 23 Gratt. (64 Va.) 919, and he finally arrives at the conclusion that "the court must determine that question in all such cases in view of all the circumstances."

3

[3, 4] In the *McCue Case,* Judge Keith quotes at length the statement of the juror on his *voir dire,* and then says: "No man can read the rigid examination to which this juror was subjected without being impressed with his fairness, with his desire to deal justly by the prisoner, and with his conscientious purpose to discharge his duty as a citizen." While very general in its terms, we do not know of a better rule to test the competency of a juror to sit on the trial of cases, civil or criminal. It certainly meets the requirements of the statute, applicable to civil cases that he shall stand "indifferent in the cause." If the examination impresses you with the fairness of the juror, his lack of bias or prejudice, his desire to do justice to both parties, regardless of former impressions or expressions, and of his good faith in that regard, he is a competent juror. In the case in judgment, the testimony of the jurors does not so impress us. We read the testimony of each juror, and ponder and consider it, and the cumulative effect of the testimony of all of them, and come away from the case with a feeling that the contestants have not had a fair trial by a jury who stood "indifferent in the cause." We return and read, and re-read the testimony of the jurors in the light of the principle that great weight should be given to the opinion of the trial judge, who has seen and heard the jurors, and by a strained effort, taking the testimony of each juror separately, we get the impression that possibly or even probably the jurors did "stand indifferent in the cause," but the impression is not lasting, and we again revert to our former conclusion. It is absolutely essential of course, to the proper administration of justice, that the tribunal which is to administer it should be fair and impartial. It is hardly less essential that it should be free from the suspicion of unfairness or partiality. The avoidance of all appearance of injustice, and as far as possible,

of all doubt on the subject, is necessary for a proper respect for the administration of the law.

[5] Most of the cases in this jurisdiction involving the competency of jurors have been criminal cases, where the issue involved was the guilt or innocence of the accused, concerning which the juror had made up and expressed an opinion based on what he had heard or read of the case, and the inquiry has generally been as to the nature or character of that opinion. But here one of the issues was the capacity to make a will and one of the questions involved was how far the jurors had, by words or conduct, made up or expressed opinions on that issue. The testator was not only a familiar figure on the streets of the city from which the jury was drawn, but two of the panel from which the jury was selected, Agner and Bickle, had business transactions with him, one of them renting his property and the other "had transactions with him in the store, selling him goods," thereby in the most positive way affirming his capacity to contract. They would have placed themselves in a very awkward position to affirm by their verdict that he did not have the capacity to make a will. Another juror, Shuey, had expressed an opinion from *"just what I know of him,"* and while he felt that he could "disregard that opinion entirely and go upon the jury, listen to the evidence and give a fair and impartial trial, based entirely upon the evidence," yet, even after thus answering, on cross-examination, he gives the following testimony:

"Q. Do you feel biased in favor of either one or the other in the case from what you know about the facts and circumstances? Have you got any personal opinion now?

"A. I expect I have rather formed an opinion on one side.

"Q. I do not ask you which side it is, but you do feel biased on one side?

"A. Yes, I believe I am.

"Q. Did you know Mr. Rust himself?

"A. Yes.

"Q. And from the facts and information as you *know them now* you feel biased one way or the other?

"A. *Very much so, yes.*"

To the same effect is the testimony of R. W. Johnson, another juror, but who was stricken from the panel. The testimony of Agner, another juror, who was stricken from the panel, will not be considered, for reasons hereinafter set forth. Another juror, Day, was not a mere acquaintance of the deceased, but seems to have been intimate with him. Deceased was at his place "a good deal" and he "knew him very well in a business way." This juror was "frank to say" that he had "formed an opinion about this matter" and was "sensible of an opinion or a conviction one way or the other at this time that would take evidence to change." The subject of the contest had been a matter of general discussion in the city, and he had frequently discussed it himself, and had also heard others discuss it. It is true that he, like other jurors, declared that he could discard his preconceived opinion and base his verdict solely on the evidence in the cause, but, as said, in a different connection, by Staples, J., in *Wright's Case,* 32 Gratt. (73 Va.) 941, 944, "such a man may persuade himself that he is impartial, but the law does not so regard him. Unconsciously to himself, it may be, his prejudices may follow him into the jury box, and influence and control his judgment there." It is not easy to see how jurors who had been intimately acquainted with the deceased for years, and some of whom had had dealings with him, could disabuse their minds of opinions as to the men-

tal capacity of the deceased, and render a verdict solely on the evidence adduced on the trial. However honest they may have been in their belief that they could do so, the law does not put them to such a test, nor subject the administration of justice to the suspicion of partiality. H. H. Fultz, another juror, had made up or expressed a *"decided or fixed opinion* in regard to the issue." How far this statement was qualified by subsequent statements made on his *voir dire* appears from his testimony hereinbefore set forth. His examination previous to the last question asked him did not sufficiently show that he stood "indifferent in the cause." Whether his answer to the last question propounded to him rendered him competent is doubtful. But the cumulative effect of doubt and uncertainty attaching to the competency of so many of the jurors cannot be overlooked, and at least casts a suspicion of unfairness or partiality on the composition of the jury which tried the issue. The matter at issue, the mental condition of the testator, was a matter largely within the personal knowledge of the jurors, and their minds were naturally affected by that knowledge. It would hardly be contended that one who had witnessed an assault would be a competent juror to try the assailant.

[6] We do not mean to say that a juror is incompetent to serve simply because he is acquainted with one of the parties, or knows some fact or facts material to the issue. There are many facts material to the issue that are not controverted, such for instance as the *corpus delicti* in a criminal prosecution, the venue of the action, the reputation of a witness for truth and veracity, and the like, but where he has knowledge of *controverted facts,* material to the issue, which would tend to bias his opinion as a juror, and it appears from his examination on his *voir dire* that he has made up and expressed an opinion upon that ques-

tion which it would require evidence to remove, he cannot be said to "stand indifferent in the cause." *State* v. *Stentz*, 30 Wash. 134, 70 Pac. 241, 63. L. R. A. 807; *Vance* v. *State*, 56 Ark. 402, 19 S. W. 1066.

As said in *Hardin* v. *State*, 66 Ark. 53, 48 S. W. 904, "When it is apparent that the juror has formed an opinion from his own knowledge of the facts of a case, or that from his connection with the prosecution or defense, he is not an impartial juror, his statement that he can give the defendant a fair and impartial trial will not remove the objection to his incompetency, for it is possible that the most prejudiced man might be willing to say, and even believe, that he would be 'an impartial juror."

[7] We adhere to the opinion in the *McCue Case, supra,* as to the character of opinions which should exclude a juror from service, but as pointed out in that opinion it is necessary not only to inquire into the quality and degree of the opinion of the juror, but also to "look into the sources of the information upon which his opinion rests." A party may be able to remove impressions or opinions which are known to rest upon newspaper reports, or other hearsay evidence. Indeed, opinions based upon such foundation are rarely fixed and decided. But when based on personal knowledge of the juror of controverted facts, it is usually of such a fixed and abiding character as to place the juror in the class of those whom the statute declares do "not stand indifferent in the cause." The mental capacity of the testator was the prime issue in the cause, and that issue should not have been submitted to the determination of jurors who had made up and expressed opinions on the subject from their intimate acquaintance and business relations with the testator. No man would like to admit that he could not do justice in a case which he is to try under the sanction of an oath, and he may be ever so honest.

in his statement that he can do justice, notwithstanding his previously expressed opinion, but where the foundation of that opinion is personal knowledge of the facts in controversy, neither the juror nor the litigants should be subjected to that hazard. The statute assures to the parties a panel of nine persons free from legal exception, and after such a panel has been obtained, then "the plaintiff and the defendant may each challenge one juror peremptorily."

[8] Application was made to the trial court for a jury from another county or city, on the ground that an impartial jury could not be obtained in the city of Staunton. The application was refused and the refusal is assigned as error. The case had been previously tried in the city of Staunton and there had been a hung jury. The record does not disclose that there had been any difficulty in getting an impartial jury in the city at that time, and, aside from affidavits filed by the appellants, it does not appear that a second impartial jury could not be obtained in the city. If the court had power to grant the application, it was in its discretion to refuse it until, by an effort in that behalf, it had been made to appear that an impartial jury could not be obtained. But the court had no such power. The method of selecting those who are to serve as jurors for the year and of drawing them for service as needed is particularly prescribed by statute (Code, sections 3142 to 3146, incl.), but no provision is made by statute for getting qualified jurors in a civil case from another city or county and the power to obtain such jurors is not inherent in the court. Section 4024 of the Code provides for such jurors in a criminal case, but not in a civil case. If an impartial jury could not be obtained in the city of Staunton, appellants should have moved for a change of venue in accordance with the provisions of section 3316 of the Code.

[9] The refusal of the trial court to grant the appellants' application for a special jury is also assigned as error. The application was one addressed to the sound discretion of the trial court, and appellants have failed to point out any error in the action of the trial court, or how they were injured by its ruling.

Indeed, the position of the appellants, both in the trial court and in this court, was and is that no impartial jury, regular or special, could be obtained in the city of Staunton. The action of the trial court on such a motion will not be reversed unless it is made to appear that its discretion has been improperly exercised. *Southern Ry. Co.* v. *Oliver,* 102 Va. 710, 47 S. E. 862; *Lemons* v. *Harris,* 115 Va. 809, 80 S. E. 740.

It is also assigned as error that the trial court refused to quash the *venire facias* on the grounds that the jury were not selected, drawn and impanelled as required by the statute. As the case has to be reversed on other grounds and the alleged error is not likely to occur on another trial, it is not necessary to consider this assignment of error.

[10, 11, 12, 13] It is also assigned as error that the trial court refused "to compel the proponents of the will to put on all their evidence in chief as to the sanity of Rust, it having appeared from the evidence they offered that Rust had been previously insane and was afflicted with 'general insanity' before and at the time when the will was written." Rust had been confined in hospitals for the insane for nearly thirty years prior to the year 1899, but in that year he was discharged as restored to sanity and continued to exercise and enjoy his rights and privileges as a sane man until his death in 1917. Sanity is the normal condition of the human mind, and every man is presumed to be sane until the contrary is made to appear. After adjudication of

insanity, a presumption of insanity continues, but a subsequent adjudication of restoration to sanity by competent authority restores the previous presumption of sanity until the contrary is made to appear. Such was the case in judgment.

The burden of proving testamentary capacity is on the propounder of the will and continues upon him throughout any contest on that question, but when he has shown a compliance with all the statutory requirements for the due execution of a will, the legal presumption of sanity comes to his relief and dispenses with any evidence to the contrary. The proof of due execution therefore entitles the propounder *prima facie* to have the will admitted to probate. *Burton* v. *Scott,* 3 Rand. (24 Va.) 399; *Wallen* v. *Wallen,* 107 Va. 131, 57 S. E. 596; *Hopkins* v. *Wampler,* 108 Va. 705, 62 S. E. 926, and cases cited; *Kerr* v. *Lunsford,* 31 W. Va. 659, 8 S. E. 493, 2 L. R. A. 668. There was no error, therefore, in permitting the propounders of the will to rest their case upon proof of the due execution of the will. They had the option to introduce their evidence as to the testator's sanity in chief, or in rebuttal. Furthermore, no injury is shown to have been sustained by the appellants by reason of the order in which the evidence was introduced. The order of introduction of evidence lies largely in the discretion of the trial court, and its ruling will not be reviewed where no prejudice or injury to the party objecting is shown. *Ches. & O. Ry. Co.* v. *Chapman,* 115 Va. 32, 78 S. E. 631.

[14] The petition for appeal contains the following assignment of error: "Your petitioners further represent that the verdict of the jury should be set aside because the court erred in giving instructions 1 and 12, inclusive, for the proponents, for reasons apparent on the face of those instructions, and because the instructions were not applicable to the evidence in the case."

This assignment of error will not be considered because the petition does not point out the error complained of. *Worley* v. *Mathieson A. Works*, 119 Va. 862, 89 S. E. 880, and cases cited.

[15] The trial court gave twenty-seven instructions on the motion of the appellants and twelve on the motion of the appellees. The appellants complain specifically of instructions 1, 3, 4 and 7, given for the appellees. The ground of objection to instructions 1 and 7 is not set forth with sufficient certainty to require consideration by this court. *Worley* v. *Mathieson A. Works*, supra.

[16] Instruction 3 was as follows: "While the burden of proof is upon those offering a will for probate, to show testamentary capacity on the part of the testator at the time the will was executed to the satisfaction of the jury, yet the court tells the jury that there is in all cases an existing presumption in favor of the testator's sanity and capacity, which is to be taken into consideration by the jury in determining the question of competency."

The objection to this instruction is that the latter part of it is in conflict with the first part. The first part told the jury that the burden of proof was upon those offering the will to show testamentary capacity, while the latter part told the jury that there is in all cases an existing presumption in favor of the testator's sanity and capacity. We have already pointed out, in another connection, the rule applicable to the presumption of sanity and do not deem it necessary to say more in this connection than that the jury could not have been misled in applying the instruction to the facts of this case.

[17] Instruction 4 was as follows: "The court instructs the jury that the testimony of credible witnesses present at the execution of the will is entitled to peculiar weight on the question of testamentary capacity and that this is especially true of attesting witnesses whose duty it is to ascer-

tain and judge of the testator's mental capacity at the time."

The objection to this instruction is that it "was erroneous in that it commented upon the weight of the testimony of the attesting witnesses to the will and told the jury 'that their evidence was entitled to peculiar weight upon the question of testamentary capacity.' " The instruction follows well established precedent and is in the exact language of instruction "P," approved by this court in *Huff* v. *Welch*, 115 Va. 74, 78 S. E. 573. We do not think there is anything in the evidence in the case in judgment which takes it out of the operation of the general rule.

As the case has to be remanded for a new trial for the reasons hereinbefore stated, it would be improper for this court to consider the ruling of the trial court on the motion of appellants to set aside the verdict because contrary to the evidence as the evidence may be different on another trial.

For the reasons hereinbefore stated, the verdict of the jury on the issue *devisavit vel non* will be set aside, and the decree of the Corporation Court of the city of Staunton, based thereon, will be reversed, and the cause remanded to said corporation court for a new trial of said issue.

*Reversed.*