# Staunton

ROSA BELLE GILMER V. JOHN A. BROWN AND OTHERS.

September 3, 1947.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston, Spratley and Buchanan, JJ.

Present, All the Justices.

The opinion states the case.

*Homer Richey* and *William Eskridge Duke,* for the appellant.

*Charles H. Houston, Bernard P. Chamberlain, Edward W. Scott* and *R. Watson Sadler,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

This case involves the validity of a will.

Mary Thomas, whose age was estimated to be anywhere from 60 to 80 years, was one of seven or eight children of Albert Brown and wife, respectable Negroes, who owned and lived on a small tract of land near Shadwell about six miles east of Charlottesville, Virginia. All of these children except Rosa Belle Gilmer, who lived and worked in Charlottesville, at or before maturity left their parental home and went to Washington or West Virginia. Mary was a steady worker and frugal. While working in Washington she saved nearly $10,000. In 1927, she returned to her parental home and lived there wtih her father until he died in 1937. She continued to live on the tract of land inherited by her and her brothers and sisters from their parents until

late in 1939. During this time she lived alone except for short periods when Martha Gilmer or Henrietta Brown stayed with her. Rosa Belle Gilmer drove from Charlottesville to Mary's home twice a week and took her food, clothing and other necessities. Mary regarded Rosa Belle as her closest relative and the one to whom she turned for aid and comfort. Some of Mary's brothers and sisters visited her once or twice a year. Her brother John brought her a ton of coal and made other small gifts.

On or about February 17, 1939, Rosa Belle Gilmer took Mary to the office of W. E. Duke, who for many years had been the attorney for this Negro family, and they informed him that Mary had been "flimflammed" of $1,500 of her hard-earned savings by a strange Negro woman upon a false promise that this stranger would buy a farm near Richmond and take care of Mary for the rest of her life. Mary had paid the stranger $1,500 in a lawyer's office in Richmond, after which the stranger had disappeared with Mary's money and could not be apprehended. These two Negro women asked Mr. Duke to take and keep safely all of Mary's property. Mr. Duke declined to assume this responsibility on their mere request, but he advised them to have a guardian or committee appointed for Mary.

Mr. Duke requested Mr. Homer Richey, another Charlottesville attorney, to draw the proper petition for the appointment of a committee. On February 22, Rosa Belle, with Mary, returned to Mr. Duke's office and signed and swore to the petition. On the same morning the petition was presented to the Honorable Lemuel F. Smith, judge of the Circuit Court of Albemarle county. The judge appointed a guardian *ad litem* for Mary, and, after examining the two women in open court, adjudged that Mary's infirmities did not require the committal of her person to a guardian but that "Mary Thomas by reason of mental and physical infirmity, impaired health and advanced age, is incapable of taking proper care of her property and incapable of handling and managing said estate and has been so for some years," and named Messrs. Duke and Richey committees for her.

The two Negro women returned to Mr. Duke's office from the court house and Mr. Duke, at Mary's request, wrote a will bequeathing and devising all of Mary's property to Rosa Belle Gilmer, should she survive the testatrix and upon the condition that she take care of the testatrix during the rest of her natural life. In the event that Rosa Belle Gilmer predeceased the testatrix, the property was bequeathed and devised to two nieces, Henrietta Brown and Martha Gilmer. The will was duly executed in the presence of two subscribing witnesses.

Mary returned to her home in the country and continued to live there alone. Rosa Belle Gilmer continued to visit her twice a week and expended the $15 a month allowed by the court and such additional sums of her own as necessary for the support and maintenance of Mary Thomas.

Several months after the will was written, a sister of Mary Thomas residing in Washington, while on a visit to Charlottesville, saw a copy of Mary's will in Mr. Duke's office.

In November, 1939, John A. Brown visited his sister and stated that he found Mary in a deplorable condition, lacking food and clothing. He took her with him to Washington, where she died on October 24, 1940.

It seems that the will, which had been left with Mr. Duke for safekeeping, had been misplaced and was not found until eighteen months or more after Mary's death. In the meantime, John A. Brown, a brother, and four sisters of Mary Thomas filed the bill in this case against the other heirs at law and Homer Richey and W. E. Duke, committees, praying that Rosa Belle Gilmer be compelled to offer the alleged will for probate and that complainants be allowed to contest its validity; that an administrator be appointed on the estate of Mary Thomas and required to settle his accounts in the cause; and that W. E. Duke and Homer Richey be required to settle their accounts as committees in this proceeding. The respondents filed separate answers, after which the parties agreed "that said cause and all matters of law and fact at issue therein shall be referred to George Gilmer, one of the Commissioners of this Court."

Of the seven issues submitted to this commissioner, the first is stated thus:

"Whether said Mary Thomas was mentally competent to execute the will made by her on the 22 day of Feb., 1939, and whether the same should be declared to be valid and the true last will and testament of the said Mary Thomas, or whether said will should be set aside and declared to be null and void."

The commissioner, in an elaborate report which was approved by the trial court, held that the filing of the petition and participation in the proceeding for the appointment of a committee estopped Rosa Belle Gilmer from asserting in this suit that Mary Thomas possessed testamentary capacity on the day the order was signed and the will was executed.

The precise question presented is whether the issues in a proceeding to appoint a guardian or committee for an adult are the same as the issues in a suit to determine the testamentary capacity of the same adult.

Judicial estoppel and *res judicata* are frequently used interchangeably and have the same significance. Estoppel, because it concludes a party from alleging the truth, must be certain to every intent and its scope should not be extended by argument or inference.

"It is essential to an estoppel by record that the identical question upon which it is invoked was in issue in the former proceeding.

" * * * . 'There must be an identity of issues, and by this is meant that the issue raised in the second suit, upon which the evidential force of the former judgment is to be directed, must be identical with the issue, or one of the issues, raised and determined in the first action.' " *Chesapeake, etc., Ry. Co.* v. *Rison*, 99 Va. 18, 34-5, 37 S. E. 320.

We have repeatedly held that a party may not assume successive positions in the course of a suit, or series of suits, with reference to the same fact or state of facts, which are inconsistent with each other, or mutually con-

tradictory. *Burch* v. *Grace St. Bldg. Corp.*, 168 Va. 329, 340, 191 S. E. 672, 677.

This court has also held that the appointment of a guardian or committee for the person and property of another is not conclusive evidence as to the mental capacity of such person to execute a deed (*Waddy* v. *Grimes*, 154 Va. 615, 153 S. E. 807); nor is a commitment to the insane asylum (*Reed* v. *Reed*, 108 Va. 790, 62 S. E. 792; *Rust* v. *Reid*, 124 Va. 1, 97 S. E. 324). In each of these cases the deed or will was executed some time after the date of the adjudication. See *Wolfrey* v. *Swank*, 184 Va. 922, 37 S. E. (2d) 17.

These decisions are in accord with the general rule that, in the absence of a controlling statute, the mere fact that one is under a guardianship does not deprive him of the power to make a will. Anno. 8 A. L. R. 1375; Page on Wills, Vol. 1, 2d Ed., sec. 710. Of course, mental capacity must be ascertained as of the date the instrument attacked was executed.

"Mental weakness is not inconsistent with testamentary capacity. A less degree of mental capacity is requisite for the execution of a will than for the execution of contracts and the transaction of ordinary business. One may be capable of making a will yet incapable of disposing of his property by contract or of managing his estate. *Greene* v. *Greene*, 145 Ill. 264, 33 N. E. 941. Mental strength to compete with an antagonist and understanding to protect his own interest are essential in the transaction of ordinary business, while it is sufficient for the making of a will that the testator understands the business in which he is engaged, his property, the natural objects of his bounty, and the disposition he desires to make of his property. *Ring* v. *Lawless*, 190 Ill. 520, 60 N. E. 881; *Greene* v. *Maxwell*, 251 Ill. 335, 96 N. E. 227, 36 L. R. A. (N. S.) 418. The condition of being unable, by reason of weakness of mind, to manage and care for an estate, is not inconsistent with capacity to make a will. *Rice* v. *Rice*, 50 Mich. 448, 15

N. W. 545; *Williams* v. *Robinson*, 39 Vt. 267." *In re Weedman's Estate*, 254 Ill. 504, 98 N. E. 956, 957.

"The adjudications of the probate court establishing facts necessary for the appointment of a conservator of the property of the testatrix were entitled to such weight as the jury saw fit to give them in determining the questions of her susceptibility to improper influence and of her soundness of mind. These adjudications were not decisive but were to be considered in connection with all the other pertinent evidence." *McLoughlin* v. *Sheehan*, 250 Mass. 132, 145 N. E. 259, 261.

The converse of this proposition is likewise true. It was held, in *Emry* v. *Beaver*, 192 Ind. 471, 137 N. E. 55, that a judgment declaring a testator of sound mind in a proceeding for the appointment of a guardian was not conclusive evidence of his testamentary capacity in a subsequent proceeding instituted to determine the validity of his will.

In *Lewandowski* v. *Zuzak*, 305 Ill. 612, 137 N. E. 500, it was held that the issue in a proceeding to commit a party to the insane asylum was not the same as the issue in a contest to test the validity of the will, and that evidence introduced in one case was not admissible in the other.

It was held, in *Keely* v. *Moore*, 196 U. S. 38, 25 S. Ct. 169, 49 L. Ed. 376, that a man may be insane to the extent of being dangerous if set at liberty and yet possess sufficient mental capacity to make a will.

In the execution of a will, "the testator has no antagonist to meet, but in ordinary business transactions are involved a contest of judgment, reason, and experience, and the exercise of mental powers not necessary in the testamentary disposition of property." *Greene* v. *Maxwell*, *supra*.

"The judicial determination of the facts that must be proved, under the statute, before a conservator can be appointed, and the *status* of the person whose property is held by a conservator, are some evidence of weakened faculties, affecting his ability properly to manage and dispose of property. It does not create a presumption of incapacity to make a will, but it is a fact proper for the consideration of

a jury in determining the question of soundness of mind." *Clifford* v. *Taylor*, 204 Mass. 358, 360, 90 N. E. 862.

The test of testamentary capacity stated in *In re Weedman's Estate, supra,* is the test applied in this jurisdiction. "Neither sickness nor impaired intellect is sufficient, standing alone, to render a will invalid. If at the time of its execution the testatrix was capable of recollecting her property, the natural objects of her bounty and their claims upon her, knew the business about which she was engaged and how she wished to dispose of her property, that is sufficient." *Tabb* v. *Willis*, 155 Va. 836, 156 S. E. 556; *Redford* v. *Booker*, 166 Va. 561, 185 S. E. 879.

The provisions of the pertinent statutes (Code, sections 1017 *et seq.*) reveal the legislative intent to recognize a distinction between, and to make different provisions for, the insane and the mentally or physically incapacitated. Before a person may be adjudged insane, the statute requires notice and an adjudication by a Commission composed of a judicial officer and two licensed and reputable physicians. "Sanity is the normal condition of the human mind, and every man is presumed to be sane until the contrary is made to appear. After adjudication of insanity, a presumption of insanity continues, but a subsequent adjudication of restoration to sanity by competent authority restores the previous presumption of sanity until the contrary is made to appear." *Rust* v. *Reid*, 124 Va. 1, 24-5, 97 S. E. 324.

The primary object of the pertinent statutes dealing with the insane is the care and custody of the person so afflicted. The primary object of the statutes dealing with mentally or physically incapacitated persons is the management of the property for their benefit.

Persons whose mental powers have been weakened by disease, old age or otherwise are easily influenced, often to their detriment. They become easy prey for the unscrupulous, who may, and sometimes do, fraudulently deprive or strip them of a part or all of their property.

Code 1942 (Michie), sec. 1080a, first enacted in 1932 (Acts 1932, p. 518), was designed to safeguard the

640

property of such persons from dissipation by their own improvidence and to preserve it for their own support and maintenance and, incidentally, for the benefit of the heirs or legatees and devisees. If some protection of this nature were not available, such persons might become charges of the State. The testamentary capacity of persons afflicted with this type of mental disorder is not necessarily destroyed. Such capacity depends upon the degree of mental impairment.

"Senile dementia is a form of imbecility due rather to the structural degeneracy caused by old age than to any specific disease. It is progressive in character, and in its advanced stages 'the brain is well-nigh stripped of its functions,' and it results in profound general mental incapacity. It is one of the most difficult of the many difficult questions of mental capacity; not because the law on the question is doubtful, but because it is so difficult to determine the point in its progress at which the faculties are so far impaired that they fall below the standard of legal capacity." Page on Wills, Vol. 1, 2d Ed., p. 254.

A review of the decisions reveals that the testamentary capacity of such persons is tested by the same formula as in cases of insanity. The test to determine whether a person is capable of properly handling and managing his estate is not the same, as heretofore stated.

The commissioner and the trial court were in error when they declared that the issues in the two proceedings were the same, and that Rosa Belle Gilmer was estopped from asserting that Mary Thomas had testamentary capacity.

This eliminates from our consideration the primary reason which caused both the commissioner and the trial court to hold that the will was invalid.

That part of the commissioner's report dealing with mental capacity indicates that, in determining Mary Thomas' testamentary capacity, he placed too much emphasis on the proceeding for the appointment of the committees—he held, in effect, that it was conclusive. The general rule is that the record of such proceeding is pertinent evidence to be

weighed with other evidence in determining the testamentary capacity. The authorities are hopelessly divided on the probative value to be given such adjudication. In addition to the authorities heretofore cited, holding that such evidence does not make a *prima facie* case of testamentary incapacity, see *In re Moore's Will*, 191 Iowa 135, 181 N. W. 763; *In re Cowdry's Will*, 77 Vt. 359, 60 A. 141, 3 Ann. Cas. 70; *In re Bean's Estate*, 159 Wis. 67, 149 N. W. 745. The authorities holding such adjudication to be *prima facie* evidence of testamentary incapacity are cited in the footnote.*

The appointment of a guardian or committee under section 1080a may be, and indeed has been, made because of the physical infirmities or because of a combination of physical and mental infirmities which fall short of mental incapacity. This being true, the appointment of a guardian or committee under this statute should not be regarded as *prima facie* evidence of mental incapacity, but the order of such appointment should be admitted as pertinent evidence to be given such weight as the jury may determine.

The trial judge, in his opinion, said that the testimony on mental capacity was in conflict and that the testimony of the family physician convinced him that the proponents

---

*Where the guardian of an adult is a beneficiary under the will of his ward, the fact of the appointment does not estop him from asserting testamentary capacity. The appointment is *prima facie* evidence of testamentary incapacity. *Breed* v. *Pratt* 18 Pick. (35 Mass.) 115.

The fact that the testator was under guardianship when the will was executed is a rebuttable presumption of testamentary incapacity but does not work an estoppel upon the proponents of the will. *In re Chandler's Will*, 102 Me. 72, 66 A. 215.

Adjudication that one is *non compos* is *prima facie* evidence of insanity and his incapacity to make a will. *In re Wheelock's Will*, 76 Vt. 235, 56 A. 1013.

Anno. 7 A. L. R. 568; *Harrison* v. *Bishop*, 131 Ind. 161, 30 N. E. 1069, 31 Am. St. Rep. 422, 425.

On this subject, see *In re Ryman*, 139 Pa. Super. 212, 11 A. (2d) 677; *In re Will of Van Houten*, 147 Iowa 725, 124 N. W. 886, 140 Am. St. Rep. 340, anno. 346; *In re Wheeling's Estate* (Okla.), 175 P. (2d) 317, 320; 28 R. C. L., Wills, sec. 51; Taylor on Medical Jurisprudence, 2 Ed., 631; 2 Freeman on Judgments, 5 Ed., 1898, *et seq.*

of the will had not borne the burden of proving testamentary capacity.

This court, in passing upon this finding of fact, is guided by the provisions of Code 1942 (Michie), sec. 6179, which declares that a report of a commissioner shall not have the same weight as the verdict of a jury on conflicting evidence. Under the influence of this section, we have said that a report of a commissioner approved by the trial court is *prima facie* correct, or is entitled to great weight, or should not be disturbed unless its conclusions are at variance with the evidence. It is fundamental that, notwithstanding the weight due a commissioner's report and the respect which is accorded his findings, neither the trial court nor this court should avoid the duty of weighing the evidence when its sufficiency is fairly challenged. *Clevinger* v. *County School Board*, 139 Va. 444, 124 S. E. 440; *Roark* v. *Shelton*, 169 Va. 542, 194 S. E. 681, and cases cited.

This leads us to an examination and analysis of the testimony tending to show that Mary Thomas possessed testamentary capacity on the date the will was executed.

The issues in the two proceedings, as stated, are not identical. They are strikingly similar in that in each the mental capacity of the same party is involved. The difference is one of degree.

Under these circumstances, it is difficult to understand the action of the experienced and reputable attorneys who, in the forenoon, successfully advocated the appointment of a committee for their client, and who, in the afternoon of the same day, made a contract with her whereby one of them agreed to, and did, prepare her will without notice to or consultation with the trial judge or without taking the precaution of having experts on mental diseases examine their client and advise them of her testamentary capacity. Failure to take either of these precautionary steps has resulted in these attorneys being named as respondents in this suit, and forced them to take the witness stand in their own behalf and on behalf of their client. Notwithstanding these

facts, the attorneys have appeared as counsel for the proponent of the will before the commissioner, the trial court and this court.

Rule 19 (171 Va. xxv) of the canons of professional ethics requires that when a lawyer becomes a witness for his client, except to merely formal matters, he should withdraw and leave the conduct of the trial of the case to other counsel. However, the fundamental rights of a litigant should not be prejudiced by the improper conduct of counsel.

The circumstances surrounding the testatrix and her mental condition at the time the will was executed are vital factors in determining testamentary capacity. The fact that the careful and painstaking trial judge determined that Mary's mental deterioration had reached the stage at which it was necessary or expedient that a guardian or committee be appointed for the management of her property, but that it had not reached such stage of deterioration that it was necessary to commit her person to the custody of another, indicates that Mary possessed sufficient mental powers to care for her physical needs.

Three witnesses, W. E. Duke, Rosa Belle Gilmer and Mrs. Alta B. Betts, testified that, after the order was drawn appointing the committees and just as Mary was leaving Mr. Duke's office, she said to him: "You haven't fixed up my will yet." To which Mr. Duke replied: "Oh, that's right, you want that done now?" Mary said: "Let's get it all over now." The contents of the proposed will were discussed in detail. Mary told Mr. Duke that she wanted Rosa Belle to have all of her property, and that, in case Rosa Belle died before she did, she wanted her property divided between her two nieces, Martha and Henrietta. Mary stated that the reason she wanted to so dispose of her property was because Rosa Belle Gilmer had done more for her than any of her sisters or brothers, and that next to Rosa Belle, she felt closer to her two nieces. After the will was typed and read to Mary, she expressed her entire approval of its contents.

Mr. Duke then asked Mr. T. L. Bogert, a businessman in Charlottesville, to come into his office. Before Mr. Bogert would sign as a subscribing witness, he looked at Mary, recognized her as a woman living on a tract close or adjacent to land he owned and said that he wanted to ask her some questions. He said she looked a little old and he wanted to check her honesty with certain things that he had in mind. One of them was that he had missed some rare bulbs which he had on his unoccupied tract of land. Mary readily admitted that she had taken the bulbs and had planted them on her place, that they belonged to him and that if he wanted them he could get them whenever he desired. After some discussion, Mr. Bogert was satisfied as to Mary's competency and signed as a subscribing witness. On cross-examination, he stated that if he had known she was incompetent or that Judge Smith had appointed a committee for her he would not have witnessed the will.

The testimony of Mrs. Betts, the other subscribing witness, was corroborative of the testimony of the above witnesses. In addition, she said that when Rosa Belle Gilmer and Mary first came into the office of Mr. Duke, for whom she was acting secretary, she discussed with Mary many matters and that Mary seemed normal. Later, when she heard Mr. Duke talking to the two women, she was very much surprised to learn that the subject matter of the discussion was the appointment of a committee for Mary; that, on the date the will was signed, Mary knew what she wanted done with her property and gave her reasons for disposing of it as she did. Mary told Mr. Duke how much money she had, where she kept it and to whom she wanted to give it.

The testimony of Mr. Homer Richey and Rosa Belle Gilmer is corroborative of that of Mr. Duke on material facts.

The only evidence (other than the record of the proceeding for the appointment of committees), which is entitled to any weight, tending to support the allegation that Mary

lacked testamentary capacity, is the testimony of the family physician, Dr. George F. Johnson. As his testimony was not transcribed, a summary was made by the commissioner. From this summary, it appears that in the opinion of Dr. Johnson Mary was insane, with no lucid intervals, and that she had been in this condition and incompetent to make a will since her father died in 1937. He does not state how often he saw or treated her. If Mary was insane and had no lucid intervals and her physical condition was such as described by Dr. Johnson, it would appear that the trial judge would not have permitted her, after February 22, 1939, to return to her home and continue to live there alone.

This testimony is in conflict with the testimony of Dr. Edward W. Stratton, Jr., a major in the medical corps of the U. S. Army who had practiced medicine in Charlottesville prior to military service. He said that he examined Mary in April, 1939, at the request of Rosa Belle Gilmer, that she was mentally sound with no evidence of any psychopathic condition. She told this doctor of her relatives, referred to them by name and said that with two or three exceptions they had neglected her and contributed practically nothing to her comfort and happiness.

Elnora B. Sellers, a teacher and a graduate of Columbia University, New York, stated that on Sundays she frequently went out to visit Mary with Rosa Belle Gilmer and found conditions at her home similar to those of the average remote country home. She regarded Mary Thomas as eccentric but mentally sound and logical.

While neither Dr. Stratton nor Elnora Sellers testified as to Mary's mental condition at the time the will was executed, their testimony, if accepted, clearly shows that Mary was not totally incompetent and at times she was normal and in possession of her mental and physical faculties.

The uncontradicted evidence is that Rosa Belle Gilmer was the only one of Mary's relatives who regularly and consistently spent her time and money giving aid and comfort to the testatrix during her declining years. The other relatives, with the possible exception of Martha Gil-

mer and Henrietta Brown, paid scant attention to her, making perfunctory visits once, possibly twice, a year until a few months before her death. Under these circumstances, the will itself reflects the normal reactions of a normal person and should be considered as evidence tending to establish testamentary capacity. Page on Wills, Vol. 1, 2d Ed., sec. 692.

The testimony of subscribing witnesses and others present at the factum is entitled to peculiar weight and, unless overcome by other persuasive evidence, settles the issue in favor of testamentary capacity. *Thornton* v. *Thornton*, 141 Va. 232, 126 S. E. 69; *Jenkins* v. *Trice*, 152 Va. 411, 147 S. E. 251.

Weighing the evidence with this principle in mind, the irresistible conclusion from the record is that Mary, by reason of advanced age and infirmities, had reached the stage of mental deterioration that it was expedient to appoint a committee to manage her property but that she had not reached the stage of mental deterioration which would deprive her of testamentary capacity. She, not her attorney nor Rosa Belle Gilmer, instigated the preparation of her will, remembered her property and named the beneficiaries in the order in which they should take.

Each of the other assignments of error is corollary to the main question decided.

The decree is reversed and the case remanded with directions to the trial court to enter the proper order upholding the validity of the will of Mary Thomas.

*Reversed and remanded.*

GREGORY, J., dissenting.